James F. HULL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19953.

United States Court of Appeals
Fifth Circuit.

Nov. 14, 1963.

**818**

Dougal C. Pope, Houston, Tex., for appellant.

Scott T. Cook, Asst. U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON and GEWIN, Circuit Judges, and HOOPER, District Judge.

GEWIN, Circuit Judge.

The appellant Hull, a Certified Public Accountant, was found guilty by a jury in the U. S. District Court for the Southern District of Texas of the charges contained in Counts 8 through 15 relating to false income tax returns alleged to have been prepared by him. Counts 1 through 4 relate to alleged false income tax returns of the OTM Corporation, and as to these counts the jury was unable to agree upon a verdict. Counts 5 through 7 had to do with alleged false income tax returns of Burleigh Sanford, Sales Manager for the OTM Corporation, and the jury acquitted Hull on the Sanford counts. We do not question the sufficiency of the evidence to support the verdict of guilty as found by the jury, but we reverse because of errors committed during the trial.

The counts under which Hull was convicted charged that he did willfully and knowingly " * * * aid and assist in, and counsel, procure and advise" in the preparation and presentation to the District Director of Internal Revenue of false and fraudulent income tax returns of 3 salesmen in violation of Title 26 U.S.C.A. § 7206(2).[1] The salesmen were employees of the above mentioned corporation. Hull was a minor stockholder and was also Secretary. The corporation paid the salesmen involved, namely, Brown, Lahrmann and Holsomback, a fixed salary plus an amount equal to 1% of their gross sales; and in some instances there was an additional allowance for automobile mileage.[2] The unreported commission sometimes exceeded the stated salary of the salesmen. There was testimony to the effect that the commission was paid to the salesmen to defray expenses in their selling en-

1. The statute is as follows:

"(2) Aid or assistance.—Willfully aids or assists in, or procures, counsels, or advises the preparation of presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document;"

2. The following summary will show the amounts involved and the counts to which they relate:

| Byron B. Brown | | Ct. 8 | Ct. 9 | Ct. 10 |
|---|---|---|---|---|
| | 1955 | 1956 | 1957 | 1958 |
| Income Reported | | 4885 | 5350 | 2750.77 |
| Commission unreported | | 3522 | 5579 | 2300 |
| David Lahrmann | Ct. 11 | Ct. 12 | Ct. 13 | |
| | 1955 | 1956 | 1957 | |
| Income Reported | 4471 | 4917 | 5212.50 | |
| Commission unreported | 5500 | 5300 | 7800 | |
| George Holsomback | | | Ct. 14 | Ct. 15 |
| | | | 1957 | 1958 |
| Income Reported | | | 5003.50 | 6140 |
| Commission unreported | | | 6700 | 6100 |

deavors and their efforts to promote sales. The record clearly demonstrates that all of the commission paid to salesmen was not used for such purposes.[3] The salesmen were required to file a statement with the company relating to the amount of commissions each salesman was entitled to receive. All three salesmen admitted that their actual expenses did not equal the amount of the 1% commission.[4] No accurate records were kept of expenses actually incurred. Each salesman asserted that he relied on the advice of the appellant Hull to the effect that it was not necessary to report the commissions. It is also evident from the record that the failure to report the commissions was a deliberate and considered conclusion, and often formed the basis of separate discussions between the salesmen involved and the appellant Hull. The practice was continued over a period of 3 or 4 years. The salesmen admitted that they considered the commission as extra compensation for services rendered; that a substantial portion of sums so received had not been expended for expenses incurred. There is ample evidence that the salesmen continued to make inquiry about reporting the commissions and questioned the accountant's advice that it was not necessary to report the same. There is no evidence that any of the salesmen sought counsel or advice from any other source. Unquestionably, the salesmen knew they were receiving income which was not reported in their respective returns.[5]

3. Salesman Brown testified as follows:
"This was another way we were paid. This was another form of our payment. The salary, as I mentioned before, was rather low, and this was another way that we were paid. This was to be used as an addition to our salary, as I understand, based on our sales incentive arrangement."

4. The statement mentioned was entitled "Salesman's Monthly Expense Report of Sales and Traveling Expenses During (month)". This statement showed total authorized expenses based on sales for the month, which amount was equal to 1% of the monthly sales. Immediately above the signature of the salesman was the statement: "I certify that the above statements are correct and that expenditures were made as listed." Usually these monthly statements were approved by the Sales Manager or by one of the company officials. No effort was made to give an itemized statement of expenditures for expenses.

5. Salesman Sanford testified as follows:
"A. Well, I realized, to answer your question, I realized when I went down to see Mrs. Casey and I made this false statement, I made it trying to protect myself and trying to protect James Hull, and when I found out that every time I opened my mouth I had my foot in it, I knew I was wrong, and I told—I don't know whether it was the first visit or second visit, when James Hull went up there with me, one of the two, I don't know which one it was,—that what I had said was untrue, and I wanted to tell the truth and I wanted to get the whole thing cleared up as quick as I possibly could.
"Q. That was right after—your next interview?
"A. I don't recall exactly the time, sir. That transpired in between my first visit and when that time was. But when you are wrong, I knew I was wrong, and I knew I had had it."
*   *   *   *   *
"THE COURT: He may ask him the question. Were you surprised when he made what you tell us was a large false expense claim, Mr. Sanford, or were you shocked, or had you had some prior conversation with him about it? That's what counsel wants to know.
"THE WITNESS: Not shocked. I was surprised, in a way. I knew he was a certified C.P.A.; I knew it was wrong, I was found guilty of it. But if I could get away with it, I would, sir.
"THE COURT: All right."
*   *   *   *   *
"Q. Did you say Mr. Hull was present?
"THE COURT: Was Hull present?
"A. In this one, yes sir.
"Q. All right, sir. Now, you said at that conference he told you that if the company accepted the salesmen's expenses, that the Government would, too?
"A. That's correct, sir.
"Q. All right. And did you tell him, are you positive, did you tell him at that time that you weren't spending the money?
"A. I don't recall whether that came up. I don't think that was the discussion,

because I think it was a known fact that we wasn't spending the money, we had to use some of that money to live on, to compensate our salaries, sir."

Salesman Brown testified as follows:

"Q. Do you recall how much you received in commissions in the year 1957?

"A. In 1957, I think it was $5,579.00.

"Mr. Moore: We have the same objection to that, Your Honor, and ask that it be stricken.

"The Court: You may have the same objection.

"Q. Was that amount reported on your tax return for 1957?

"A. No.

"Q. Of that amount, how much did you actually expend for selling expenses?

"A. Well, again, we didn't keep records, and again, [377] the figure agreed on was $800.00.

"Q. Could you have spent more than $800.00?

"A. I believe I testified that I didn't. I had no—I didn't have records to that amount, though, I mean.

"Q. Would you say, now, that that is the highest estimate, that you would not have spent more than $800.00 during that year?

"A. To the best of my recollection, I would say that."

* * * * *

"Q. Well, now, did you expenses actually equal one per cent of your sales each month?

"A. No, they didn't. I walked into a situation that was already set up, and I filled out these forms, because this was the way we were told to fill them out."

* * * * *

"Q. What were these forms used for, sir?

"A. This was another way we were paid. This was another form of our payment. The salary, as I mentioned before, was rather low, and this was another way that we were paid. This was to be used as an addition to our salary, as I understand, based on our sales incentive arrangement.

"Q. Now, you have testified that the commissions you received during '56, '57, and '58 did not appear on those returns. Did you ever have any discussions with Mr. Hull, the man who prepared that return?

"A. Yes, sir.

"Q. About them not appearing on that return?

"A. Yes, I discussed it with Mr. Hull several times. I questioned whether it was legal to treat this as non-taxable, whether it was legal to treat it as an expense, and he said that it was, this was the way they had been doing it, and that it was all right. That it was working."

* * * * *

"A. This was a worksheet I had given to Mr. Hull in addition to my W–2 forms and these other things, to help him in preparing my income tax return; and on this work sheet, I would go through my checkbook and I would list on here things I thought might be deductible, because I was depending on him to fill our my form, but I knew I had to bring things to his knowledge so he could make decisions on it. So I would have medical expenses, doctors' bills, interest from savings accounts, and this sort of thing on here.

"Q. Did you also include items of income on there?

"A. Yes.

"Q. And do you recall giving this to Mr. Hull in any one of these particular years?

"A. Yes, I gave this to Mr. Hull, I believe I had it dated here 1957.

"Q. And on the first page of this exexhibit, does there not appear 'Commissions received,' and the amount?

"A. Yes. I looked—I went through my checkbook and looked at the stubs, and they showed I received this much commissions during this year, and I wrote down 'Commissions received,' because I was still questioning whether they should be treated as an expense or not, because I wanted to be sure."

* * * * *

"Q. You said you knew—you thought these commissions ought to be reported; why weren't they reported?

"A. Well, because I relied on the advice of what I thought was competent counsel, not to report them.

"Q. Who was that?

"A. Mr. Hull. Mr. Hull was the C.P.A. that worked for O-T-M; I had worked for other companies that had C.P.A.'s, they had filled out my retur_s, and I never had any problems. I logically thought that would be the place to go."

* * * * *

"Q. Isn't it a fact that this Revenue agent's report we have been talking about, that that shows—

"A. Because of the fact that the commissions that should have been reported weren't reported, there was a penalty involved on me. I don't know what they call it.

"Q. And isn't it a fact—

"A. I had to pay a penalty.

"Q. Isn't it a fact that you agreed with Internal Revenue that the fraud penalty

was a proper penalty to impose against you on those tax returns?

"A. I paid the penalty.

"Q. I beg your pardon.

"A. I paid the penalty."

Salesman Lahrmann testified as follows:

"Q. I will hand you Government's Exhibits 14, 15 and 16, which are tax returns for 1955, '56 and '57, and ask you if these are the tax returns that were filed by you during those years.

"A. (Examining the exhibits) Yes, sir.

"Q. Were these the returns that were prepared by Mr. Hull?

"A. Yes, sir.

"Q. Are these returns correct, and were they correct when you filed them?

"A. No, they are not correct."

* * * * *

"Q. Would you point out to the ladies and gentlemen of the jury how they are not correct?

"A. They don't show my one per cent commission on them."

* * * * *

"THE COURT: Counsel is talking about entertainment, monies you spent to incur the good will of your clients, and so forth.

"THE WITNESS: I think Internal Revenue has a statement on that, where we arrived at that. Not more than seventy-five per cent.

"THE COURT: Seventy-five per cent of what?

"THE WITNESS: Of the amounts, like in '55, $5500.00.

"Q. The commissions?

"A. That one per cent commission, yes.

"THE COURT: You mean you spent about seventy-five per cent of $5500.00, which would be around thirty-seven or thirty-eight hundred dollars, for entertaining customers?

"THE WITNESS: Yes, sir.

"THE COURT: And things of that sort?

"THE WITNESS: Yes, sir. I think the Internal Revenue Department has a statement to that effect.

"THE COURT: Is that your best judgment?

"THE WITNESS: Yes, sir.

"THE COURT: As to what the true figure would be?

"THE WITNESS: Yes, sir.

"THE COURT: Would that be true for the other two years?

"THE WITNESS: Yes, sir."

* * * * *

"Q. Did you have other occasions to talk to him about those, except each time you sought to have him prepare your return?

"A. Yes, sir, it was discussed, other than just at the time we prepared the return.

"Q. Well, when you discussed it, what was discussed? Would you relate to these gentlemen what was discussed?

"A. Well, I just asked them about—this was going on before I went to work there, and I asked them how to handle it, and he said not to turn it in, because if the company accepted it as expense, there was no need in reporting it.

"Q. Then you asked him about whether they should be reported or not?

"A. Yes, sir."

* * * * *

"A. Well, they told us that the one per cent was supposed to be used as—for our sales expenses.

"Q. That's right.

"A. But they never made us have any receipts or anything, or whether we spent all of it, or more of it or less of it.

"Q. You never did have a firm accounting, each month?

"A. No, sir.

"Q. And maybe some months you might go over, you might spend more money than you got; some months you might spend less. You say you spent about seventy-five per cent; did you ever spend, in one month, any more than you got?

"A. No, sir, I don't think so."

* * * * *

"Q. Is your tax liability settled at this point, or is it still open?

"A. Still open.

"Q. Still open.

"A. It is settled. It is not entirely paid up.

"Q. Oh, you are paying it out a little bit at a time?

"A. Yes, sir.

"Q. Did they assess any penalties against you, Mr. Lahrmann?

"A. Yes.

"Q. A fraud penalty, fifty per cent ad valorem fraud penalty?

"A. Yes.

"Q. And you agreed to it?

"A. Yes.

"Q. And you are paying it off?

"A. Yes."

Salesman Holsomback testified as follows:

"Q. You were a pilot for the company?

"A. Yes, sir.

"Q. How were you paid in that year?

"A. I had my base salary and my car allowance, and I was given an additional pay, commission.

"Q. You had a base salary, a car allowance, and some additional pay?

"A. Yes, sir.

"Q. O.K., sir. How did you receive this additional pay? What was that?

"A. Well, it was—Mr. Bradshaw just come up with a figure of two or three hundred, additional pay, to supplement my income, and he was counting it as a commission, on—I filled out a commission form.

"THE COURT: Commission on what?

"THE WITNESS: Just an additional income, sir, and I filled it out on a regular salesman's commission form.

"THE COURT: But it wasn't a commission, if I understand you?

"THE WITNESS: No.

"THE COURT: You didn't sell anything?

"THE WITNESS: No, sir.

"Q. Was this compensation for your duties as a pilot?

"A. Yes, sir."

* * * * *

"Q. All right. What figures did you include on those forms, to get this additional compensation?

"A. I didn't include it. Mr. Bradshaw would put down two and half or three hundred, depending on how many trips I made that month, and just whatever he wanted to increase my salary."

* * * * *

"A. Well, that was what was given back to me, and that's what I paid on that, yes, sir.

"Q. Is all the income that you received from the O-T-M Corporation reported on those returns?

"A. No, sir.

"Q. And would you describe what income is not reported?

"A. Well, the percentage of the—the commission on the sales is not included on it.

"Q. That is, for 1958?

"A. Yes, sir.

"Q. When you were a salesman. Before you were a salesman, is the compensation you received, you said you received during 1957, is it reported on there?

"A. I don't think so, no, sir.

"THE COURT: What part of 1957's income is not reported? You mean this business that you say one of the officers gave you, which might vary from month to month, something of that sort?

"THE WITNESS: It did vary from month to month, yes, sir. In other words, I had a base salary, and if I made two or three trips, you know, to Chicago or something like that, in a plane, I may get three hundred dollars, or three hundred fifty, and if I didn't do much but work in the shop, I might get two hundred a month. It was just a figure he picked out.

"THE COURT: That is what you secured by filling out one of these forms you showed us?

"THE WITNESS: Yes, sir.

"THE COURT: And that is what was not included on your income tax?

"THE WITNESS: Yes, sir.

"Q. You say you had Mr. Hull prepare these returns for you. What information did you furnish him to prepare these returns?

"A. My W-2 form and doctor bills and so forth, and household.

"Q. Did you tell him about this other compensation that you say you received?

"A. Well, he knew about that, yes, sir.

"Q. How did he know about it?

"A. It was discussed at the office, his office, discussed out at our office, and we were told—I was told, 'Don't worry about it, it will be taken care of.'

"Q. Did those amounts that you received during 1957, which you say were not reported on those returns, did you use those amounts to—for expenses in connection with your business?

"A. Some of it was used, yes, sir.

"Q. Can you estimate how much was used during those two years?

"A. Well, I think in 1957 I made sixty-one hundred, and I think I spent about six hundred dollars for the year.

* * * * *

"Q. After reading that statement, Mr. Holsomback, is your memory refreshed as to how much compensation you received that was not reported on that income tax return for 1957?

"A. Yes, sir.

"Q. How much is that?

"A. For the year '57, I believe it was sixty-seven hundred.

"Q. And of that, how much did you actually spend in connection with your business?

"A. Six hundred dollars.

"Q. And for the year 1958, how much did you receive as this other compensation, in commission, that is not reported on your 1958 return?

"A. Sixty-one hundred.

"Q. And of that, how much did you actually spend for sales expense?

"A. Four hundred dollars.

"THE COURT: Well, now, these figures you have given us, sixty-seven

Hull contends that the counts under which he was convicted are insufficient because they fail to state the amount of income which was not reported, resulting in an absence of essential facts upon which to base a conclusion that the returns were false as to "a material matter". We disagree with the appellant and hold the counts involved to be sufficient. Gaunt v. United States, 1 Cir., 1950, 184 F.2d 284. We further conclude that there is no merit in Hull's contention that the trial court erred in failing to charge the jury that a showing of a tax deficiency is a prerequisite to conviction.

There are 11 specifications of error. Some of them contain no merit, but we have concluded that there was error in the refusal of the trial court to instruct the jury as to the law applicable to the testimony of accomplices. We do not approve the written charge requested by the appellant as a correct statement of law on the subject, but that charge together with the objections of the defendant clearly and forcefully brought the question to the attention of the trial court. There was objection to the court's failure to charge on the subject. Of importance also is the fact that the court stated to the jury the court's opinion that the Government's case under the corporation counts was not nearly so strong as it was under the remaining counts having to do with income tax returns of the various salesmen.[6] Further, after the jury had deliberated for

hundred for 1957 and sixty-one hundred for 1958, was that your total compensation, including salary, or was that this, what you called extra compensation that you got on the commission, by filling out the commission form?

"THE WITNESS: There was extra, sir, besides this.

"THE COURT: The salary was in addition to the sixty-seven hundred and in addition to the sixty-one hundred?

"THE WITNESS: I think, yes, sir."

* * * * *

"Q. Did you, Mr. Holsomback, when you had Mr. Hull prepare these returns, did you ask him why those commissions and other income that you had received was not reported on those returns?

"A. We discussed that, yes, sir.

"Q. Would you tell us what you discussed?

"A. Well, we have asked—I asked Mr. Hull several times out at the company why we were not reporting the commissions, and he would say that we didn't have to, and not to worry about it.

"Q. Did you tell him that you had only those relatively small amounts of actual expense that you have testified to, and that the rest of it you did not spend for sales expense?

"A. Well, he knew, yes, sir, about what we were doing with it, because I was—

"Q. How did he know?

"A. We talked about this."

* * * * *

"THE COURT: All right. If you told him, you can tell us the circumstances.

"THE WITNESS: Yes, sir. Well, we discussed it out as the company quite a few times. When Mr. Hull would come out to the company, we would talk about this, and why wasn't it declared, and he said, 'Well, don't worry about it. We'll take care of it, don't worry about it.'

"THE COURT: Well, now, what counsel asked you was, if Hull knew you had only spent about six hundred dollars one year and about four hundred dollars the second year on your business expenses, entertaining clients, and so forth, or customers, and so forth; was he aware of that?

"THE WITNESS: The exact amount I don't think he was, sir. But we were told we didn't have to worry about that, anyway.

"THE COURT: I know; but I am asking you how Mr. Hull knew about it, and whether you told him. Did you tell him at any time about how much you in fact were spending for these purposes?

"THE WITNESS: Well, I am sure that I did, sir."

6. "I might say to you that in my judgment, the Government's case is not nearly as strong on these O-T-M counts as is true on the remaining counts, having to do with the income tax returns for the various salesmen. The reason I say that is that it is undoubtedly true that these books and records out there were voluminous, that there has been no direct proof that Mr. Hull actually knew of these errors, and you must, if you find that he did know of these errors and these falsities in the income tax return, must more or less rely on the circum-

approximately an hour and a half, it returned to the courtroom and the foreman requested the court to restate its instructions to the jury as to the first 4 counts of the indictment, which were the counts relating to the OTM Corporation. Not only did the court have its oral charge re-read as to the first 4 counts, but the statement quoted in the margin referring to the counts involving the salesmen was read again to the jury. At this point, counsel for the appellant again called to the attention of the court the fact that it had refused to charge the jury as to accomplice testimony; and repeated appellant's objection to the emphasis of the court on the importance of the testimony of the salesmen. The jury was left with the emphasis naturally attendant upon the second reading of the charge.

As stated in our recent case of Dunn v. United States, 5 Cir., 1963, 318 F.2d 89, the better and safer practice is for counsel to submit a written request for instructions in accordance with Rule 30 F.R.Crim.P. As there pointed out however,[7] oral requests are sufficient if the court is clearly informed of the point involved. In the instant case the subject was brought to the court's attention by the requested charge, and by 2 separate and distinct objections on the part of the defendant pointing out the failure of the court to charge on the matter of accomplice testimony. One of the salesmen, Sanford, who appeared as a Government witness against Hull, was criminally prosecuted, entered a plea of guilty, and received a sentence in Federal court in Houston, Texas, under an indictment charging tax evasion, which charge arose out of, or at least related to substantially the same subject matter as that involved here. At the time of trial the other 3 salesmen, Lahrmann, Brown and Holsomback, had agreed to a 50% fraud penalty arising out of the very transactions for which Hull was being prosecuted. As pointed out in Dunn and in Phelps v. United States, 5 Cir. 1958, 252 F.2d 49, the existence of reversible error in a given case depends on the circumstances of that case and the conduct of the trial as a whole. In our view there was convincing evidence that the salesmen were accomplices with Hull; but to say the least, there was ample evidence from which the jury could have drawn a valid conclusion that they were accomplices. We conclude that the jury should have had an opportunity to decide whether the salesmen who testified were accomplices, and then to weigh carefully the credibility of their testimony after receiving a proper cautionary instruction. Ward v. United States, 5 Cir. 1961, 296 F.2d 898. We reject the argument of the Government that the court's charge on credibility was sufficient in this case, where the record so clearly demonstrates the necessity of a charge on accomplice testimony. We do not criticize the charge as to its sufficiency on the subject of credibility, but a charge as to credibility should not be taken as a substitute for an accomplice charge.

Prior to the trial, the Internal Revenue Service had audited the income tax returns of salesmen Brown, Holsomback and Lahrmann, certain adjustments were made, and the evidence shows that there were additions to the tax and fraud penalties were imposed. Indeed, the salesmen stated on the witness stand that their returns were false and in effect stated that they were aware of the fact that all income received by them was not included in the return. The tone of such testimony was to lay the blame on Hull. A careful reading of the record however, clearly demonstrates that each of the salesmen repeatedly engaged in discussions with Hull showing a consciousness of omissions of income, and questioned the advice they claimed Hull had given to them. They did not volun-

---

stances of the case in reaching that decision; while as to the case of the several salesmen, there is direct proof from, I believe, each of the salesmen, that they told him and discussed with him the very matters which it is contended were false and fraudulent."

7. See Footnote 4 of the opinion in Dunn.

tarily amend their returns prior to investigation by Internal Revenue Service, nor did they seek the advice of any other person. The salesmen acquiesced in the adjustments mentioned and accepted the reports of the Internal Revenue Agents as a substantially correct statement of their income.

The appellant issued a subpoena duces tecum to each of the salesmen requesting them to bring these reports to the trial. The reports were brought, but when the appellant Hull demanded to see them, the trial court refused to require the reports to be delivered in accordance with the subpoena, and left it to each salesman as to whether he desired to deliver such reports voluntarily. The court stated in open court that he did not see the relevancy of such reports. No question of self-incrimination or other objection was made and so far as we can determine, none was involved. The reports were not delivered solely because, as one witness stated: "I don't see any point in taking up more time." At that point the court stated: "I don't believe I do, either." To say the least, the salesmen were hostile to Hull. As pointed out by the court in its oral charge, the testimony of the salesmen was strong and direct against Hull. Any statement by them or conduct on their part which contradicted the testimony being given from the witness stand was vital and important. The evidence involved tended to contradict what the witnesses were stating. One of the chief issues in the case was whether the salesmen had fully informed the appellant Hull of all income received. One of the salesmen, Brown, admitted on the stand, for example, that he never did mention to Hull a substantial item of income received by him from a source not related to his business as salesman. It is clear to us that the salesmen should have been required to produce the reports in response to the subpoena in order to permit an examination of them; and if they were competent and relevant evidence, as is indicated, the defendant should have been permitted to use the same in cross-examining the witnesses who testified against him, all under the careful scrutiny and supervision of the trial court. Gordon v. United States, (1953) 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447.

The appellant Hull specifies errors for failure to permit him to examine certain reports and documents in the possession of revenue agents who testified at the trial in violation of the Jencks Act, 18 U.S.C.A. § 3500. The record with reference to this phase of the case is thoroughly muddled and confused. It is obvious that the defendant was permitted to examine some of the documents requested, but it cannot be determined with accuracy which ones he was permitted to examine and which ones were withheld.[8] In order to avoid confusion

---

8. For example, certain documents were transmitted to this court in a sealed envelope with the notation "Government tenders not admitted". The record repeatedly speaks of Government tenders to the court and Government tenders to the defendant, but the documents being tendered are often unidentified. The various tenders are not identified in the record by numbers. The record clearly shows that some of the documents requested were delivered to the appellant, but the appellant argues as though they were not. The Government's brief does not contend that the documents were delivered to the appellant, but argues that the appellant was not entitled to receive them.

We quote from the record:

"MR. COOK: Your Honor, I tender the Court four memorandums of interviews—two memorandums of interviews and two affidavits which were taken from David Lahrmann by this witness.

"THE COURT: Affidavits from Lahrmann?

"MR. COOK: Yes, sir.

"THE COURT: Which this witness took? We are not interested in those.

"MR. COOK. I think that's what they were trying to get, Your Honor. I believe that's what they are asking for.

"THE COURT: These instruments, which are affidavits from the witness— not from the witness, from one David Lahrmann, which were simply taken before Mr. Buller, I think are not within the purview of the statute. I will give those back to you.

"MR. COOK: Your Honor, these are extra copies that we have, and we will tender them for the record.

upon retrial of the case, the proceedings should be conducted in such manner that the record will eliminate the confusion as to the materials taken from the prosecutor's file which were given or shown to defendant's counsel; which ones were admitted into evidence, and which documents were withheld. This direction applies to all documents which may be involved. United States v. Bernard, 7 Cir. 1961, 287 F.2d 715; United States v. Cardillo, 2 Cir. 1936, 316 F.2d 606; Palermo v. United States, 1959, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287; Campbell v. United States, 1963, 373 U.S. 478, 83 S.Ct. 1356, 10 L.Ed.2d 501.

 We do not approve the following argument of the prosecuting attorney: "You have the opportunity, right now, to stop what this man has been doing. Counsel stated the Government had brought fifteen counts so that we would make this man look bad. Let me state right now, it could have been forty-five counts. Every act he did violates several different laws. That indictment could contain forty-five different counts. How many other things are wrong with the books and records out there no one knows."

Neither do we approve the following argument of defense counsel to which the prosecuting attorney was making response:

"* * * A lot of times, they throw things, a lot of items like that at a person, hoping that the jury will get one on one side and one on the other, and they will have a compromise and say, 'Let's find him guilty on one or two counts.' "

Both arguments are improper and are of like kind. Dunn v. United States, 5 Cir. 1962, 307 F.2d 883.

Reversed and remanded for proceedings not inconsistent herewith.

"THE COURT: Do you want to make it part of the record to show that I passed on them?

"MR. COOK: Yes.

"THE COURT: All right. And the other thing is a statement—is a memorandum which apparently Mr. Buller and another special agent made of an interview which they had with David Lahrmann, and I think it is not pertinent to the subject matter of the testimony. Mark that also.

(Several Government tenders marked by the clerk, and placed in the clerk's file.)"

* * * * *

"MR. COOK: Your Honor, we also tendered to defendant's counsel the affidavits of David Lahrmann: It is one affidavit, a memorandum of interview, and a statement of David Lahrmann. We ask that they be marked as tenders, and shown that they have been turned over to them.

(Several Government Tenders marked by the clerk.)"

Even with the confusion indicated, we find amongst the sealed Government tenders the affidavit of David Lahrmann. On the other hand, the record strongly indicates that the defendant was allowed free access to the affidavit of witness Lahrmann. The confusion indicated recurred throughout the record.