**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Art BERNAL, Defendant-Appellant.**

No. 86–2350
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

March 30, 1987.

Dan B. Gerson, Houston, Tex., for defendant-appellant.

Henry K. Oncken, U.S. Atty., James L. Powers, James R. Gough, John R. Braddock, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, and GARWOOD and HILL, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Arthur Bernal (Bernal) appeals his conviction following a jury trial on charges of conspiracy, mail fraud, and theft of federal funds in connection with appellant's contract with the federally funded City of Houston Summer Food Program. Appellant complains of the denial of requested jury instructions on the credibility of accomplice witnesses. We determine that reversible error occurred, and reverse and remand for a new trial.

## I.

In 1984, Randy Bostic, a severed co-defendant, was a part-time employee of the City of Houston, Texas, in the city's Parks and Recreation Department ("PARD"). Bostic coordinated the summer food program ("the program"), which provided free lunches on weekdays for children involved in various city-sponsored activities at more than one hundred sites throughout the city.

Lunches were also assembled for field trips and delivered to the sites of the outings. All lunches for the entire program were prepared by a single caterer under a contract PARD placed through competitive bidding.[1] The caterer was obligated to fix and deliver meals in accordance with daily requirements estimates from PARD issued one day before the meals were needed.

PARD used "monitors" to track the total number of meals actually delivered on any given day, with some monitors remaining at a single site each day (site monitors) and others, seasonal PARD employees, moving from site to site and also serving as the sole check on field trips (food monitors). The caterer's employees were required to carry a three-part form indicating the number of lunches that were delivered to each location. Monitors were required to count the meals delivered, indicate the number actually received, sign the form, take two copies of it, and deliver one copy to PARD. The caterer retained a copy and periodically submitted claims to PARD indicating the number of lunches delivered to each location each day and the total number of meals for which reimbursement was required. PARD employees could compare the totals recorded by monitors to the numbers shown in the caterer's claim and determine whether any discrepancies existed. After PARD approved the caterer's claim, it would be mailed to the Texas Department of Human Services in Austin, and United States Department of Agriculture funds, administered by the State of Texas, would then be disbursed to PARD, also by mail, and subsequently, through PARD, to the caterer.

The government's case indicated that Bostic controlled the hiring of seasonal employees for the program, the ordering of meals, and the lunch-accounting system. The evidence reflected that Bostic hired "ghost" monitors, who never visited sites but who accepted city paychecks and either signed meal-count forms without having any knowledge of the actual number of lunches delivered, or remained silent while others filled out the forms and forged the monitors' names. One such ghost monitor worked half-time and attended school half-time; another held a full-time job in a bank; and yet another was employed on weekdays at a location miles from the city.

Bostic apparently could create paperwork ordering as many meals as he wished and, by completing paperwork for the ghost monitors, show receipt of meals never delivered. The theory of the government's case was that, to profit from the scheme, Bostic also had to find a catering company that would cooperate by billing for lunches never made or delivered and by sharing with Bostic funds the caterer would receive for meals never prepared. Evidence showed that Beatriz Guerrero, Bostic's former secretary who had worked in the program during previous years, was familiar with the operation and paperwork of the lunch program and was offered as a knowledgeable expert and adviser to the caterer who won the contract. Evidence indicated Guerrero picked up PARD's meal requirements estimates daily, delivered them to the caterer, and prepared the claims for lunches served indicating the total funds due the caterer. Program records showed that thousands of meals were delivered, and reimbursement was paid, for field trips which witnesses said could not have occurred.[2]

1. The invitation for bid stated that the "estimated number of children participating is 13,000 to 16,000 daily." Appellant Bernal was awarded the contract to provide the lunches with a bid based on fifty-five days of meal service—from June 4 until August 17 exclusive of weekends and holidays—and established a company, AMBCO, to perform the contract. The price per meal in his bid varied from $1.37 for days when 13,000 or fewer lunches were required to $1.23 for more than 15,000. The total allocated for food for the entire program under the contract was consequently between $979,550 and $1,082,400.

2. For example, the caterer, Bernal's company, AMBCO, claimed reimbursement for 9,360 lunches purportedly delivered on one day during a three-day period when AMBCO had been closed down by city health inspectors. AMBCO and PARD records also showed that as many as 6,000 lunches were delivered for some outings, but other evidence indicated that some field trip sites listed could not accommodate the numbers of people for whom lunches were purportedly

Appellant Bernal, the only bidder on the program contract, set up a catering company (AMBCO) specifically to serve the lunch program using the dining area of his wife's restaurant to prepare the meals. Guerrero served as Bernal's assistant and program record keeper. Expert estimates based on the amount of supplies such as bread and meat AMBCO ordered showed that AMBCO could not have prepared the number of lunches for which the caterer received reimbursement,[3] and evidence including Bernal's own testimony showed that Bernal gave $80,000 to Bostic soon after the summer program ended. Bernal was charged with participation in the conspiracy to defraud the government by use of the mails and seven substantive counts and was convicted of the conspiracy charge and of four substantive offenses.[4] Art Jones, a PARD assistant director and Bostic's supervisor, was tried together with Bernal but acquitted by the jury on all charges.

Although the evidence summarized here and other evidence at trial provided a substantial basis for a reasonable jury to infer

that Bernal cooperated in the fraud, nevertheless, the testimony most directly implicating Bernal was that of Gregory Maldonado,[5] a friend of Bostic who acted as Bostic's accomplice in setting up the scheme. Maldonado's testimony was the only direct evidence that Bernal actually knew that he was participating in a scheme to defraud the government.

Maldonado testified that before the program contract was put out for bids Bostic offered to pay him some $800 if Maldonado could locate a dishonest caterer who would bill for nonexistent lunches and help in Bostic's scheme. Maldonado testified that he knew that about a million dollars was allocated in the program for food, and that he told prospective caterers both that there was a lot of money to be made and that the contract would go only to a caterer who agreed to cooperate in the fraud. Maldonado said that he first contacted Lorenzo Garza, who sold produce, and Garza's brother-in-law, who owned a restaurant. Maldonado stated that he and Bostic met with Garza, that they described the fraudu-

served, and that the largest number of field trip participants for whom PARD could have provided transportation was only some 200 to 300 individuals. PARD's director testified that larger field trips could not have escaped his notice because they would have attracted media attention and because the logistic problems posed by a larger gathering would inevitably have involved other PARD officials and PARD divisions (to provide transportation, portable bathrooms, on-site supervisors, etc.).

3. Corina Augustin, a Texas Department of Human Services auditor, testified that she studied Bernal's business records and concluded that in June AMBCO purchased enough bread to make some 98,400 sandwiches and enough meat or cheese to prepare about 82,000, but that AMBCO had filed claims showing 156,000 sandwiches delivered during June. AMBCO provided lunches on about seventeen weekdays in June, excluding the three days when AMBCO was shut down by the health department; Augustin's accounting indicated that an average of no more than 5,800 sandwiches could have been delivered each day, about thirty-six percent to forty-five percent of the 13,000–to–16,000 daily total lunch requirement PARD had specified in its invitation to bid. In contrast, AMBCO's claims for reimbursement indicated that an average of about 9,200 lunches were served each day in June, between fifty-seven percent and seventy-one percent of the PARD contract estimates.

Evidence indicated Bernal received a total of about $486,000 for service provided until AMBCO was finally shut down by the health department on July 27 (for not maintaining proper storage temperatures on lunches).

4. The conspiracy count, Count 1, was based on 18 U.S.C. § 371. The substantive counts included: four counts of mail fraud (18 U.S.C. § 1341) (Count 2, claiming $226,087 on July 10, 1984; Count 3, causing the delivery of a check for $186,086 on July 26, 1984; Count 4, claiming $300,742 on August 2, 1984; and Count 5, causing the delivery of a check for $260,742 on September 14, 1984); and two counts of theft of government funds (42 U.S.C. § 1760(g)) (Count 11, receipt and retention of $104,000 in funds obtained fraudulently on August 9, 1984; and Count 12, receipt and retention of $67,400 on October 1, 1984). Bernal was also charged with one count of bribery of a public official (Count 14, under 18 U.S.C. § 201(c)(2) (making it unlawful for a public official to accept a bribe), instead of the subdivision of that section, § 201(b)(2), making it unlawful for one to give a bribe to a public official), but was acquitted on the bribery charge. Bernal was also acquitted of Counts 2 and 3, but was convicted on Counts 1, 4, 5, 11, and 12.

5. Maldonado identified himself at trial as "Gregory" but endorsed checks as "George" and was referred to as "George" during the trial.

lent scheme in full, and that Garza agreed to participate. Maldonado said that Bostic's secretary, Guerrero, was sent to Garza to handle the necessary paperwork, but that Garza was cut out of the deal after one week because he boasted about how much money he was going to make and disclosed too much about the plan.

Garza, who had testified as a government witness against Bostic in Bostic's trial, appeared as a defense witness for Bernal and asserted that he had sought the catering work only because Maldonado had told him that there was an opportunity for a large but legitimate profit, and that there had been no hints of illegality. Garza also stated that he understood he was not given the catering work because Bostic learned that he was a Mexican national.

Maldonado and Garza both testified that Garza put Maldonado in contact with Bernal after it became clear that Garza would not get the contract. Maldonado said that he met with Garza and Bernal, and that the three "talked about how many sandwiches were to be made" and "padding" billing with "[e]xtra lunches ... that would be charged that would not be made," and that Bernal "appeared to be very interested." Maldonado claimed that he and Bostic met with Bernal shortly thereafter, and that they agreed all legitimate profits would go to Bernal and all proceeds from padding would flow to Bostic. Maldonado testified that Bostic confirmed Bernal would have the contract at a third meeting attended by Bostic, Garza, Bernal and his wife, and Maldonado. Once more, both Bernal's and Garza's testimony contradicted Maldonado's, and both said that Bostic was not present at the third meeting (in fact, Bernal and his wife claimed that Bernal first met Bostic only after he was awarded the contract), that those present merely discussed operating a legitimate lunch program, and that there was no indication of any illegality.[6] Bernal claimed that he and his wife decided to hire Guerrero after they met her at a public meeting held for those interested in bidding on the lunch program, and that they hired her because of her past experience but were unaware of her ties to Bostic and his plan.

Bernal's defense was that he had supervised the preparation and counting of all lunches prepared by AMBCO, that he believed AMBCO had never prepared more than 225 meals for a field trip, that Guerrero had handled all the paperwork and that he had admittedly signed his name to some documents without reviewing them carefully, and that he had paid money to Bostic because, after the program ended, he had received threatening calls first from Maldonado, then from an unknown caller, and later from Bostic demanding money, and that he had paid the sums demanded because he believed Bostic was connected with organized crime.[7] Bernal claimed he had performed according to the contract and contended that he had received only the money he had earned and, in effect, that even if fraud had occurred he had known nothing about it.

Although it is plain that a properly instructed jury might disbelieve Bernal's version of events, we also observe that the only evidence directly contradicting Bernal's self-exculpatory explanation for his conduct was provided by Maldonado, whose own testimony clearly indicated that he was an accomplice of Bostic in initiating

---

6. Bernal's wife, Janie Capettillo, also testified that Bostic was not at meetings Maldonado had said Bostic attended, that so far as she knew her husband had never met Bostic before the contract was awarded to AMBCO, and that Maldonado had never indicated that any illegalities were planned for the meal program. She also controverted other details of Maldonado's testimony in a manner consistent with the testimony of Garza.

7. Both Bernal and Maldonado testified that Bernal gave Maldonado $10,000 out of the proceeds of the caterer's first reimbursement check, and Maldonado's testimony, supported by that of another witness, was that this sum was subsequently delivered to Bostic. Bernal admitted he gave an additional $70,000 directly to Bostic but claimed that he believed his family would be harmed unless he complied with Bostic's demands. Bernal also introduced a police report indicating that, shortly after he received the first large reimbursement check, windows at his wife's restaurant were broken and his truck was vandalized. On cross-examination, Bernal and his wife acknowledged they had never sought police help and had not previously disclosed this version of events to those investigating the fraud.

the fraud and some parts of whose testimony were contradicted both by the appellant and by other witnesses, one of whom, Garza, had been a government witness in the earlier case against Bostic. Maldonado testified that no criminal charges had been brought against him for his role in the scheme, but that he had received no guarantees of immunity or promises that he would not be prosecuted. Although other evidence supported much of what Maldonado said, some of his testimony was both extremely incriminating to Bernal and entirely uncorroborated. We also observe that—with the exception of Maldonado's testimony—the government's case against co-defendant Jones was similar to the case against Bernal in that it relied primarily on evidence from which a jury might infer that both defendants were knowledgeable about and active in the fraud, but that Maldonado offered no significant evidence against Jones [8] and that Jones was acquitted on all charges.

## II.

We address in this appeal only whether Bernal properly requested a cautionary ac-

**8.** Maldonado's only testimony implicating Jones was that, when Maldonado collected the $10,000 from Bernal, Bernal said he would not be giving Maldonado any money except for the fact that Jones had instructed him to do so. Evidence from sources other than Maldonado showed that Jones had given PARD approval for payment for the lunches purportedly served and that he had received money from some of the ghost monitors' paychecks, which were typically cashed with the monitor retaining at most $100 out of each check.

**9.** This part of the charge was as follows:
"I would say consider all the evidence. That doesn't mean you have to accept all the evidence as true and accurate. You are the sole judges of the credibility or believability of each witness and how much weight should be given to his testimony. In weighing the testimony of the witness you should consider his relationship to the Government or to the Defendant, his interest, if any, in the outcome of the case; his manner of testifying; his opportunity to observe or acquire knowledge concerning the facts about which he testified; his candor, fairness and intelligence and the extent to which it has been extended in support of that conduct or by the believable evidence[. Y]ou may in short accept or reject the testimony of any witness in whole or in part."

complice credibility instruction and whether the district court's refusal so to instruct the jury was reversible error. We conclude that Bernal did, with at least minimal adequacy, request such a jury instruction and object to its omission, and that the failure to give an instruction on this topic was error and was not, under the evidence here, harmless.

At the close of all evidence, the district court stated that it would "of course give counsel an opportunity to object to the charge or request additional charge after it's given." Bernal's attorney stated, "I have an objection to [the] jury instruction," but was told, "Why don't you wait until after." After both sides finished their closing arguments, the district court charged the jury, giving, *inter alia,* a general witness credibility instruction.[9] The district judge then directed the jury to retire and did not instruct them to delay beginning deliberations, but, instead, suggested that they could start deliberating immediately.[10]

With the jury excused, the following exchange ensued:

**10.** Although the jury was first told, "At this time the lawyers have the opportunity to make objections to my charge and to ask if I'll give you additional charges," when the jury was directed to retire a few moments later (at about 3:50 p.m.), it was then informed, "I'm going to call you in at 5:00 o'clock and send you home for the evening, unless you've reached a verdict which, of course, is your privilege.... That doesn't mean you can't reach a verdict in the next hour and ten minutes, that's your privilege." We observe that deferring objections to a charge until after the jury retires has been questioned unless the jury is instructed not to begin deliberations until the court has resolved any objections to the charge. *See United States v. Hollinger,* 553 F.2d 535, 545 n. 12 (7th Cir.1977) (describing some methods a district court may use to delay beginning of jury deliberations until after all objections to jury charge can be considered, including questions arising from "some ground of objection [which] surface[s] during the actual giving of the charge"); *see also United States v. Eiland,* 741 F.2d 738, 742 (5th Cir.1984) (noting that "[a]lthough the jury had been excused, they were told not to begin deliberations until further notice" and describing the district court's instruction that the jury delay deliberations as "usual procedure" when objections to the charge are considered after the jury has been excused).

"THE COURT: You may be seated, ladies and gentlemen.

"Has the government any additional requests to charge or objections to the instructions?

"MR. POWERS: No, sir.

"THE COURT: Mr. Burge? [Attorney for co-defendant Jones.]

"MR. BURGE: Your Honor, I would request the Court give request, Art Jones request of the jury 21 and 22—

"THE COURT: Why don't you hand them up so I just make sure they remain on the record. I'll mark these refused. I believe I've covered the matter adequately, but it will still be in the record.

"Mr. Gerson? [Attorney for defendant Bernal.]

"MR. GERSON: Yes, Your Honor. We object to the exclusion of Defendant's Requested Instruction Number 6 which is concerning the testimony of an informant as providing for pay, et cetera and also, of course, I would like to—

"THE COURT: That's refused.

"MR. GERSON: Of course, I'd like leave to join any objection Mr. Burge has made.

"THE COURT: Anything further? Would you all like to make sure you get the exhibits together....

"We will stand recessed."

None of the three instructions defendants requested—Bernal's number 6 and Jones' numbers 21 and 22—were given to the jury.

■ We find that the district court properly refused Bernal's requested instruction number 6 because it was not relevant to the instant case.[11] However, we view defendant Jones' proferred jury instruction number 22, adopted by appellant, as adequately directing the jury to consider carefully the weight accorded to uncorroborated testimony from an accomplice.[12] Because we find that the district court's refusal, despite this request, to give any instruction in reference to accomplice testimony requires that Bernal's conviction be reversed, we do not address whether it was error to refuse Jones' requested instruction number 21, also adopted by appellant.[13]

11. Bernal's requested instruction number 6 was directed solely at the credibility of "an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication." Because there was no evidence that any informer testified in the case, no error could result from the court's refusal of the instruction. *Cf. United States v. Santos,* 483 F.2d 35 (5th Cir.) (failure to give a requested "accomplice" instruction is not error unless some person who testified could be considered to be an accomplice), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973); *United States v. Gonzales-Palma,* 645 F.2d 844 (10th Cir.) (accomplice instruction is inappropriate when witness is a government agent), *cert. denied,* 454 U.S. 861, 102 S.Ct. 316, 335, 70 L.Ed.2d 159 (1981); *see also* Annot., *Necessity of, and Prejudicial Effect of Omitting, Cautionary Instruction to Jury as to Accomplice's Testimony Against Defendant in Federal Criminal Trial,* 17 A.L.R. Fed. 249, § 12(a), at 312–14 (1973) (citing and discussing decisions finding no error in refusal of a requested instruction that does not properly state the law or reflect the actual status of a witness).

12. This accomplice testimony instruction stated:
"The testimony of an alleged accomplice, or of a witness who provides evidence against a defendant as an informer, or for immunity from punishment, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You the jury must decide whether the witness' testimony has been affected by any of those circumstances, or by his or her interest in the outcome of the case, or by prejudice against the defendant, or as a result of being immunized from prosecution; and, if you determine that the testimony of such a witness was affected by any one or more of those factors, you should keep in mind that such testimony is always to be received with caution and weighed with great care.

"You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt."

We note that this instruction is drawn almost verbatim from a pattern charge commonly used in this Circuit. *Compare* Instruction 2A: Accomplice—Informer—Immunity, *in* United States Fifth Circuit District Judges Association, Pattern Jury Instructions: Criminal Cases, at 34 (West 1978). Although a form of this charge more precisely tailored to the instant case would have omitted reference to informers, the instruction does caution a jury about reliance on an accomplice's uncorroborated testimony.

13. Jones' number 21 instructed the jury to view cautiously the testimony of Maldonado, two

### III.

■ Appellant contends that he properly adopted Jones' objection to the omission of proposed instruction 22, and the government counters that the district court never ruled on Bernal's request. We note that the government raised no objection to this request when it was made, and we also observe that holding that a defendant can properly rely only upon his own objections and only on instructions he submits could result in duplicative objections and a plethora of proposed—and possibly varying— jury instructions from several co-defendants on a single subject in the jury charge. We therefore conclude that in the absence either of an objection to Bernal's request by the government pointing to some sound reason for refusing to permit one defendant to adopt another's objections, or a statement by the district court refusing to permit such adoption, or other exceptional circumstances indicating that the procedure may have materially misled the district court or opposing counsel, Bernal was entitled to adopt his co-defendant's objection and to rely on the instruction proposed by Jones.[14]

We next address the issue of whether Jones' objection to the omission of requested instruction number 22 met Rule 30's requirement for a specific objection:

"At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.... The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. *No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.*" Fed.R.Crim.P. 30 (emphasis added).

The government argues that Jones' attorney merely referred to his requested instruction by number and calls to our attention *United States v. Bey*, 667 F.2d 7 (5th Cir.1982), in which we held that a defendant's objection to the omission of five requested instructions, identifying the instructions only by stating their numbers, did not satisfy Rule 30. *Id.* at 10.[15]

■ We note that Jones' objection in this case was apparently cut short by the district court and that Jones' offer consisted of only two proposed instructions, both of which were immediately handed to the district court for its consideration. The court thereupon indicated it was aware of the content of these requested instructions, and promptly refused them. We cannot conclude that the facts of this case are directly analogous to those of *Bey*. In the instant case, in contrast, the contents of the proposed charges were immediately apparent to the court, and the record suggests that the defendant was not afforded the opportunity to explain his objection fully. In light of all the circumstances, we are also compelled to conclude that appel-

ghost monitors, and a woman friend of Jones who received funds from two ghost monitors' paychecks and delivered the money to Jones. Instruction 21 characterized these witnesses as having a motive to falsify because they might offer evidence to "procure his or her own freedom, receive a lesser sentence, or avoid other criminal charges." Although none of the named witnesses had been charged or prosecuted, each witness was cross-examined on the subject of bargains with the government, and each indicated that no promises of immunity or favorable treatment had been extended.

14. *See* 2 C. Wright, *Federal Practice and Procedure: Criminal* § 484, at 701–02 n. 7 (2d ed. 1982) (citing cases holding defendants may be permitted to rely on objections by co-defendants); *see also id.* at 702 & n. 8 (stating, "A party may object to an instruction given by the court although he has not requested an instruction of his own on the point.").

15. *See also United States v. Adkins*, 741 F.2d 744, 748 (5th Cir.1984) (holding that a general objection about failure to adopt requested instructions "does not meet the requirements of Rule 30"), *cert. denied* 471 U.S. 1053, 105 S.Ct. 2113, 85 L.Ed.2d 478 (1985); *United States v. Hecht*, 705 F.2d 976, 978–79 (8th Cir.1983) (holding that an objection to omission of "instructions requested by the Defendant" is inadequately specific to inform the court of potential error and to preserve error for review).

lant's attorney was entitled to believe that further objection would not be entertained. The district court first deferred objections to the charge until after the jury retired [16] and then summarily refused instructions offered by the defendants, cutting off both Jones' and Bernal's objections in midsentence. Because Jones offered only two instructions, and because number 22 was handed directly to the bench, and the court indicated its familiarity with it, we cannot conclude that the specific nature of either Jones' request or Bernal's objection were obscured. Taking these factors together, we believe that they present a materially different situation than that in *Bey*, and that in this respect the present case is more properly governed by *United States v. Eiland*, 741 F.2d 738, 742 (5th Cir.1984), particularly as the record reflects that the district court was aware of the basis of the request and objection and indicated its desire to hear no more. We conclude that here the objection must be regarded as adequate under the circumstances, if perhaps only minimally so.

■ Examining the witness credibility instruction which the court gave the jury (note 9, *supra*), we determine that it did not touch on the specific concerns addressed by a cautionary instruction respecting accomplice testimony. *See Hull v. United States*, 324 F.2d 817, 824 (5th Cir. 1963) (stating that a general credibility charge is inadequate if an accomplice instruction was requested and appropriate); *see also Bey, supra,* at 10 (noting that the substance of a requested charge may be included in other instructions given by the court, and that the court need not adopt the defendant's specific wording). Consequently, we cannot conclude that omission of the requested accomplice instruction was cured by equivalent language elsewhere in the court's charge.

■ We have held that it is reversible error to refuse to give a cautionary accomplice instruction in appropriate cases if an accomplice testifies against a defendant and if the defendant properly requests such an instruction. *E.g., Hull, supra; Dunn v. United States*, 318 F.2d 89 (5th Cir.1963).[17] Our decisions do not, of course, automatically treat the refusal to give such an instruction as reversible error in all cases involving accomplice testimony. Instead, " '[w]hether the error is reversible error depends on the circumstance of each case and the conduct of the trial as a whole.' " *Dunn, supra,* at 93 (quoting *Phelps v. United States*, 252 F.2d 49, 53 (5th Cir.1958)). A defendant properly requesting such an instruction is generally entitled to have the jury charged on that topic if important elements of the accomplice's testimony are uncorroborated by other direct evidence [18] and if circumstan-

---

**16.** This is contrary to Rule 30, particularly where, as here, the jury was not told to delay its deliberations until further notice. However, we do not base our holding on this departure from Rule 30 as such; it merely forms a small portion of the context from which counsel could reasonably conclude that further objection would be futile and unwelcome.

**17.** "Failure to give the charge in appropriate cases is reversible error, unless the appellate court, after considering all the circumstances of the case, such as the extent of the challenged testimony and the adequacy of the general instructions on credibility, is satisfied that reversal is not required." 2 C. Wright, *supra,* § 490, at 750–51 (footnotes omitted; citing, *inter alia, Hull, supra,* and *Dunn, supra* ); *id.* at 66 (Supp. 1986).

**18.** In *Dunn,* for example, we stated that "[i]t is crucial that the only testimony that [the defendant was directly involved in the offense charged] came from" the accomplice. 318 F.2d at 91. The appellant in *Hull* allegedly advised salesmen to file fraudulent tax returns; although incriminating circumstantial evidence existed, the direct evidence implicating Hull came from four salesmen, each of whom had either been prosecuted or paid penalties for tax violations, 324 F.2d at 824, and each of whom "asserted that he relied on the advice of" Hull, *id.* at 819. *See also McMillen v. United States,* 386 F.2d 29, 34–35 (1st Cir.1967) (citing *Dunn* and *Hull* for the proposition that refusing a requested accomplice instruction may be reversible error if the accomplice's uncorroborated testimony "stood as the sole or dominant source of incrimination"), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968).

We note that decisions in which the defendant did not ask for such an instruction, unlike *Dunn* and *Hull,* and which consequently involved plain error review, may have described a defendant's entitlement to an accomplice cautionary instruction in different terms in dictum. *E.g., United States v. Garcia,* 528 F.2d 580, 587–

tial evidence tending to corroborate the accomplice's testimony is not compelling or supports that testimony only through a chain of inferences that is less than immediate and not altogether clear. In the instant case, as discussed above, Maldonado's testimony about Bernal's knowing participation in the fraud was entirely uncorroborated and was not directly supported by unequivocal circumstantial evidence that was equally effective in controverting Bernal's defense. Other factors, such as the existence of testimony contradicting Maldonado's, support finding that Bernal was entitled to the cautionary instruction.[19]

Concluding that a defendant was entitled to an accomplice instruction, and that such a charge was adequately requested but refused with sufficient objection being made, does not require automatic reversal of a conviction if the error was harmless because it did not affect substantial rights. Fed.R.Crim.P. 52(a).[20] "In applying the test for 'harmless error' set forth in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed.2d 1557 (1946), our primary question is what effect the error had, or reasonably may have had, upon the jury's decision. We must view the error, not in isolation, but in relation to the entire proceedings." *United States v. Brown*, 692 F.2d 345, 350 (5th Cir.1982).

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment

88 (5th Cir.) ("In this Circuit, a defendant is entitled to a special cautionary instruction on the credibility of an accomplice or a government informer if he requests it and the testimony implicating the accused is elicited solely from the informer or accomplice.") (citations omitted), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 (1976); 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976); *see also United States v. Jones*, 673 F.2d 115, 121 (5th Cir.) (applying plain error standard when accomplice instruction was neither requested nor given, but stating that "it would have been reversible error not to have done so if requested"), *cert. denied*, 459 U.S. 863, 103 S.Ct. 140, 74 L.Ed.2d 119 (1982); *Jones*, 673 F.2d at 117–21 (discussing plain error standard); *Davis v. United States*, 411 F.2d 1126, 1128–29 (5th Cir.1969) (discussing purpose of accomplice instruction).

**19.** We note that factors this Court examines in reviewing the lack of an accomplice instruction under the plain error standard may be helpful in determining a defendant's entitlement to such an instruction when it is properly requested, although these factors may be applied more generously when the instruction is properly requested. Omitting an unrequested cautionary instruction may be plain error if three conditions exist: (1) there are significant indications the testimony may be of questionable reliability (a strong motive to falsify such as self-exculpation or leniency in plea agreements or sentencing; important inconsistency within the testimony or with the testimony of other accomplices; the testimony is incredible or insubstantial on its face; other witnesses contradict the accomplice's statements on significant matters; or, in the case of an informant witness, unusually high levels of payment or pay that appears contingent on convicting a defendant); (2) the testimony is largely uncorroborated; and (3) the

testimony is incriminating to the defendant in a manner that makes it central to the government's case (there is little other strong evidence, or evidentiary questions are close). *See Jones, supra,* 673 F.2d at 118; *United States v. Hinds,* 662 F.2d 362, 370 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1720, 72 L.Ed.2d 140 (1982); *United States v. Nabrit,* 554 F.2d 247, 247–49 (5th Cir.1977); *Garcia, supra,* 528 F.2d at 588; *Davis, supra,* 411 F.2d at 1128–29.

We observe that other Circuits consider additional factors in determining whether omission of an unrequested accomplice instruction is plain error. *See, e.g., United States v. McCabe,* 720 F.2d 951, 955 (7th Cir.1983) (discussing varying approaches of the Courts of Appeals applying plain error doctrine; considering whether accomplice credibility was brought to the jury's attention through cross-examination and attorneys' closing arguments); 2 C. Wright, *supra,* at 751 n. 10 (collecting cases).

**20.** Although our prior opinions involving a requested cautionary instruction have not directly addressed the harmless error standard, neither have they held that reversal is inevitably mandated by the omission of a requested instruction to which the defendant was entitled. *E.g., Joseph v. United States,* 286 F.2d 468, 469 & nn. 3–7 (5th Cir.1960) ("If a proper written request [for an accomplice instruction] ... had been filed, and if [the accomplice's] testimony had not been corroborated, the cases just cited indicate that it *may* well have been reversible error to refuse to give the cautionary instruction. This Court has so indicated in dealing with requests to caution the jury as to accomplice testimony.") (footnote omitted; emphasis added)), *cert. denied,* 372 U.S. 979, 83 S.Ct. 1114, 10 L.Ed.2d 144 (1963). Rule 52(a) requires that harmless errors "*shall* be disregarded" (emphasis added).

should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos,* 66 S.Ct. at 1248 (citations omitted).[21]

■ In light of the entire record of the instant case and the fact that Maldonado's testimony was the government's strongest evidence of appellant's guilty knowledge, we cannot say with fair assurance that failure to give any accomplice testimony instruction, after one had been adequately requested and objection made to its refusal, "did not materially affect the jury's decision." *Brown, supra,* at 351. Consequently, we reverse Bernal's conviction and remand for a new trial.[22]

REVERSED and REMANDED.

21. "[I]t is not the appellate court's function to determine guilt or innocence [or] ... to speculate upon probable reconviction and decide according to how the speculation comes out.... Those judgments are exclusively for the jury...." *Id.,* 66 S.Ct. at 1247. *See also United States v. Morrow,* 537 F.2d 120, 145 (5th Cir. 1976) (holding that, when evidence against defendants was "not overwhelming," introduction of defendants' *nolo contendere* pleas to similar prior offenses "undoubtedly had a substantial effect on the deliberations of the jury" and was not harmless), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Taylor,* 508 F.2d 761, 765 (5th Cir.1975) (evidence against the defendant was less than overwhelming and co-defendant's incriminating statement was not cumulative; improper admission of co-defendant's statement was held not harmless).

22. We observe that on retrial the district court will face a problem somewhat more complex

than that common in cases involving accomplice testimony. Garza or Bernal's wife might be viewed by a jury as accomplices; their testimony, however, tended to exculpate Bernal. It has been held reversible error to instruct the jury that accomplices testifying on behalf of the defendant should be believed only if the jury finds their testimony "true beyond a reasonable doubt" because such a charge has the effect of shifting the burden of proof to the defendant. *Cool v. United States,* 409 U.S. 100, 93 S.Ct. 354, 357, 34 L.Ed.2d 335 (1972). When there are accomplices testifying both for and against a defendant, the case may require a carefully drawn instruction. *See* 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 17.06, at 532–33 (3d ed. 1977) (discussing appropriate instructions for such cases); *id.* at 382–83 (Supp. 1986) (quoting instruction approved by the Sixth Circuit as complying with *Cool* in the retrial of a case involving exculpatory accomplice testimony, *United States v. Stulga,* 584 F.2d 142 (6th Cir.1978)).