UNITED STATES, Appellee

v.

Scott D. GIBSON, Private
U.S. Army, Appellant

No. 02-0443

Crim. App. No. 9900573

United States Court of Appeals for the Armed Forces

Argued November 6, 2002

Decided January 9, 2003

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., EFFRON, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant:  Captain Brian S. Heslin (argued); Colonel Robert
   D. Teetsel, Lieutenant Colonel E. Allen Chandler, Jr., and
   Major Imogene M. Jamison (on brief); and Colonel Adele H.
   Odegard.

For Appellee:  Captain Abraham F. Carpio (argued); Lieutenant
   Colonel Margaret B. Baines, Lieutenant Colonel Lauren B.
   Leeker, Major Mark L. Johnson (on brief); and Captain
   Theodore C. Houdek.

Military Judge:  Donna M. Wright

**This opinion is subject to editorial correction before final publication.**

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of conspiring to commit premeditated murder, violating a general regulation by possessing drug paraphernalia, making a false official statement, and wrongfully possessing and using marijuana, in violation of Articles 81, 92, 107, and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 907, and 912a (2002), respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for five years, and total forfeitures. The Court of Criminal Appeals affirmed the findings and sentence without opinion.

This Court granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED IN REFUSING TO GIVE A REQUESTED ACCOMPLICE INSTRUCTION AT APPELLANT'S COURT-MARTIAL.

For the reasons set out below, we hold that the military judge erred.

## Factual Background

In February 1998, Private First Class (PFC) Toni Bell hired Private (PV1) Kurtis Armann to kill the father of her oldest child. PFC Bell believed that the father was attempting to gain custody. PFC Bell agreed to pay PV1 Armann a $5,000 non-refundable deposit. She also agreed that if she tried to cancel the contract to kill the child's father, PV1 Armann would then be authorized to kill her. When PFC Bell found out that her child's father was not seeking custody, she told PV1 Armann that she did not need his services. PV1 Armann told her that she was still

required to pay the $5,000, even if she no longer wanted the child's father killed. She never paid the $5,000 deposit.

At some time in March 1998, PV1 Armann began to talk with his group of marijuana-smoking friends about various schemes to kill PFC Bell. This group consisted of PV1 Armann, PV1 Monica Oie, PV1 Jeremy Lund, PV1 Jeremy Ashby, and Appellant. At various times, PV1 Armann talked about poisoning PFC Bell, injecting her with a heart-stopping drug, smashing her head against the dashboard of her car, building a car bomb, knocking her car off the road with a four or five-barreled "blast gun," luring her onto a highway rest stop and shooting her, and shooting her while she walked her dog. Appellant was not a party to the discussions about poison and a car bomb because these discussions occurred while he was deployed to Bosnia.

Based on sketches and ideas from PV1 Armann, PV1 Roy Tarbox made two weapons for PV1 Armann in the unit's machine shop. The first weapon blew up when PV1 Armann test-fired it. PV1 Tarbox made a second weapon, which PV1 Armann and PV1 Lund successfully test-fired on October 7, 1998.

On October 10, 1998, PV1 Armann shot PFC Bell while she was on gate-guard duty, using a weapon made in the unit's machine shop by PV1 Tarbox. The bullet was deflected by the collar of her kevlar vest. The bullet penetrated three-fourths of an inch into her neck but did not kill her.

At the outset of the trial, the Government conceded that Appellant "was not the main driving force behind this conspiracy," but it contended that Appellant was a member of the team that planned to kill PFC Bell. Appellant was charged with

two specific overt acts in furtherance of the conspiracy: reconnoitering the dog-walking trail used by PFC Bell and reconnoitering and timing the highway routes used by PFC Bell.

The defense theory was the Appellant never took PV1 Armann seriously and constantly ridiculed his plans. The defense asserted that Appellant was cut out of the conspiracy to shoot PFC Bell and not involved in the plans to build the weapon that was used to shoot her.

The Government relied primarily on the testimony of three alleged co-conspirators to prove the conspiracy: PV1 Oie, PV1 Tarbox, and PV1 Lund. A fourth, PV1 Ashby, testified for the defense. PV1 Tarbox, PV1 Lund, and PV1 Ashby testified under a grant of testimonial immunity.

PV1 Oie had already been tried when she testified. She did not have a grant of testimonial immunity, but her case was pending action by the convening authority at the time of appellant's trial.

PV1 Oie testified that she had pleaded guilty to two drug offenses, solicitation to commit murder, and conspiracy to commit murder. She did not mention that she was awaiting the convening authority's action on her sentence. In her clemency petition, submitted shortly after Appellant's trial,[1] she asked the convening authority to reduce her sentence for several reasons, including her testimony against Appellant. PV1 Oie's clemency petition recites that she was "the prosecution's essential key witness" against Appellant, and "really did make the

---

[1] Appellant was sentenced on June 3, 1999. PV1 PV1 Oie's clemency petition is dated June 29, 1999.

4

prosecution's case against [Appellant]."  At the court below, the Government conceded the possibility that "[PV1] Oie was motivated to 'save her own skin' at the expense of Appellant," and that her desire for leniency from the convening authority might have "entic[ed PV1] Oie to minimize her own criminal involvement at the expense of [A]ppellant."

PV1 Oie testified that Appellant was one of her core group of friends, along with PV1 Armann and PV1 Ashby.  Her boyfriend at the time was PV1 Armann, but she was "pretty close" to Appellant.  After PV1 Armann shot PFC Bell and was put in pretrial confinement, PV1 Oie became romantically and sexually involved with Appellant.

PV1 Oie testified that she and her friends would often "hang out," smoke marijuana, and discuss PV1 Armann's various plans to kill PFC Bell.  Appellant "would criticize and give advice on why the plans wouldn't work or why they might work."  She testified that Appellant was more involved in the plans to shoot PFC Bell than she was.  During September 1998, Appellant "expressed doubts on if it would ever occur, and irritation that, you know, [PV1] Armann wasn't carrying through, and impatience."  On one occasion, Appellant said, "I don't see why he just doesn't walk into her house and slit her throat and walk out."

PV1 Oie testified that at one time she and PV1 Armann planned to poison PFC Bell.  She and PV1 Armann kept the poison in their rooms.  She was not present when the plan to shoot PFC Bell at a rest stop was rehearsed.  Her knowledge of that plan came from PV1 Armann, who told her that Appellant's part of the plan was to be a lookout.

PV1 Oie, Appellant, PV1 Armann, and possibly PV1 Ashby saw the second weapon. She testified that Appellant aimed it out the window and said it needed a magnifying scope. According to PV1 Oie, Appellant told PV1 Armann to trust him, that he was a good shot, and that he would not miss.

PV1 Oie testified that on February 1, 1999, Appellant purchased marijuana for both of them. They were smoking it in her room when the military police came and confiscated the marijuana and the paraphernalia they used to smoke it. She testified that she and Appellant owned the paraphernalia jointly.

On cross-examination, PV1 Oie testified that it was always PV1 Armann who brought up the subject of killing PFC Bell. Appellant and PV1 Ashby criticized PV1 Armann's plans, and, according to PV1 Oie, "They weren't sure of his credibility or stability, in general, to carry them out." PV1 Oie admitted that she never heard Appellant say that he wanted PFC Bell to be dead or that he wanted to kill her. She also admitted that she never saw Appellant do anything to "facilitate any of these plans." Finally, she admitted that all she saw was "[the] guys sitting around talking . . . , [PV1] Armann talking about his plans to kill PFC Bell . . . , [the] guys trying to change the subject . . . , [and that PV1 Armann] kep[t] coming back with a plans [sic]."

In response to questioning by the military judge, PV1 Oie testified that Appellant expressed doubts about PV1 Armann's ability to carry out a plan, and that he criticized and made fun of PV1 Armann's plans. She explained that PV1 Armann would "come up with one plan, and then come up with another plan and another

6

plan. And the plans, he would never follow through with any of them." Finally, PV1 Oie admitted that her knowledge of Appellant's participation in the plan to shoot PFC Bell in the rest area came from PV1 Armann.

After the members had closed for deliberations, they requested that PV1 Oie be recalled. On recall, she testified that Appellant had never talked to her about reconnoitering the dog-walking trails. She testified that her belief that Appellant participated in that reconnaissance was based on her conversations with PV1 Armann. On cross-examination, PV1 Oie admitted that Appellant did not tell her that he participated in the reconnaissance, but only that he thought that the trail was too long and "it would take too long to get there and back."

PV1 Tarbox had already been convicted of attempted premeditated murder and conspiracy to commit aggravated assault when he testified under a grant of testimonial immunity. He testified that Appellant came to the machine shop once while he was working on the first weapon. When asked how Appellant reacted when he saw the weapon, PV1 Tarbox responded, "He, basically, thought it was neat, sir. A nice little toy, I guess. I don't know." PV1 Tarbox testified that appellant did not come back again.

PV1 Lund had been convicted of conspiracy to commit murder and attempted murder when he testified under a grant of testimonial immunity. He participated in "quite a few" discussions with Appellant and others concerning the death of PFC Bell. He testified that the plan to shoot PFC Bell at the highway rest area was discussed, with Appellant present, "two or

7

three times at a minimum."  He, PV1 Armann, PV1 Ashby, and Appellant did a "dry run" of the plan, which called for Appellant to be either a driver or a lookout.  PV1 Lund testified that Appellant expressed no reluctance about participating.

PV1 Lund testified that PV1 Armann and Appellant told him about a plan to shoot PFC Bell while she walked her dog.  He testified that he understood that Appellant's role was "[t]o be a secondary shooter to make sure that she dies."

PV1 Lund testified that PV1 Armann came up with all the plans, and that Appellant "was pretty much out of the picture" when they decided to shoot PFC Bell while she was on guard duty. Once PV1 Armann and PV1 Tarbox started to make the weapons, there was considerable animosity between PV1 Armann and Appellant because PV1 Armann felt that Appellant was "getting too close to Private PV1 Oie."  PV1 Lund admitted that he did not know of any motive on the part of Appellant to kill PFC Bell.

PV1 Ashby testified for the defense under a grant of immunity.  At the time of Appellant's trial, PV1 Ashby had not yet been tried for his involvement in the shooting of PFC Bell, and he did not know what the disposition of the charges against him would be.  He testified that he did not take any of PV1 Armann's talk seriously, because it was "too outrageous, too many plans, along with all the other stories he told."  PV1 Ashby testified that he and Appellant had concluded that PV1 Armann "essentially, was full of crap."

PV1 Ashby and Appellant were riding in the back of the car, talking and smoking marijuana, when PV1 Armann drove to the rest area that he had mentioned as a possible site for killing PFC

Bell. PV1 Ashby and Appellant did not take this plan seriously. Appellant got out of the car and walked to a lookout point. PV1 Armann then drove to that point and picked him up. The "dry run" took about five minutes. On cross-examination, PV1 Ashby admitted that he gave PV1 Armann "a lot of" .25 caliber ammunition and a laser pointer. He insisted, however, that he did not take PV1 Armann's plan to kill PFC Bell seriously.

Sergeant (SGT) James Chapman testified that, shortly after the shooting, Appellant told him "they got her good in the neck." On cross-examination, he agreed that Appellant said "they," not "we." SGT Chapman notified his platoon sergeant about Appellant's comments. The information was transmitted to the local office of the US Army Criminal Investigation Command (CID).

CID Special Agent (SA) James Towle interviewed Appellant and obtained a statement in which Appellant denied any knowledge of the identity of the shooter. This statement was the basis for the charge of making a false official statement.

SA Timothy Fitzgerald interviewed Appellant on February 1, 1999, after PV1 Oie's room was searched and some marijuana and paraphernalia were seized. He testified that Appellant waived his rights and orally confessed to possessing and using marijuana with PV1 Oie.

After both sides had rested their cases, defense counsel requested that the military judge give an accomplice instruction regarding the testimony of PV1 Oie, PV1 Lund, PV1 Tarbox, and PV1 Ashby. The standard instruction in the Military Judge's Benchbook cautions the court members that an accomplice may be motivated to testify falsely because of self-interest in

obtaining leniency or immunity from prosecution. Legal Services, Dep't of the Army, Pamphlet 27-9, Military Judges' Benchbook 7-10 (2001). The instruction advises the members that an accomplice's testimony, even if it is corroborated and apparently credible, "is of questionable integrity and should be considered by [the court members] with great caution." Id. See United States v. Bigelow, 57 M.J. 64, 65 n.1 (C.A.A.F. 2002) (setting out the "standard" instruction).

The military judge declined to give the accomplice instruction, explaining that, in her view,

> [T]here's got to be something in the witnesses' testimony to suggest minimizing their own involvement and pointing the blame at others, or something that they have to gain by virtue of testifying. And it doesn't appear that any of – Well there was no evidence that any of them had anything to gain . . . by virtue of testifying. And I didn't see anything to indicate that they were minimizing their own involvement.

In closing arguments, the two sides argued different interpretations of essentially the same facts. The Government argued that the various conversations among PV1 Armann, PV1 Oie, PV1 Lund, and Appellant were serious and resulted in an agreement to kill PFC Bell. Appellant's disparaging comments about PV1 Armann's ideas were characterized as constructive critiques designed to improve the plan. The activities at the dog-walking trail and the rest stop area were characterized as reconnaissance and dry runs. The Government argued that Appellant bragged to SGT Chapman about the shooting.

The defense argued that Appellant was "cut out of the picture" before PV1 Armann acquired the weapon from PV1 Tarbox and shot PFC Bell. The defense characterized the conversations

10

among PV1 Armann, PV1 Oie, PV1 Lund, and Appellant as idle, marijuana-fueled chatter. The defense argued that Appellant did not take PV1 Armann seriously and that he ridiculed PV1 Armann's schemes as fantasy. The defense emphasized that Appellant told SGT Chapman that "they," and not "he," shot PFC Bell. In rebuttal, the Government conceded that Appellant might have been "cut from the team" before PV1 Armann shot PFC Bell. The Government urged the members to carefully consider PV1 Oie's testimony. He argued:

> The best witness you heard out of this court-martial was Private Oie. That's why we led with her and we put her up here first. The reason why she was such a great witness was because she was honest . . . . The reason why she's such a good witness is, because her best friend in the whole wide world is [Appellant].

In her instructions, the military judge instructed the members on the elements of conspiracy as follows:

> At or near Hanau, Germany, between on or about 1 July 1998, and on or about 10 October 1998, the accused entered into an agreement with [PV1] Jeremy Lund and Private Kurtis Armann to commit the premeditated murder of Private First Class Toni Bell, an offense under the Uniform Code of Military Justice;
>
> And that while the agreement continued to exist and while the accused remained a party to the agreement, the accused, Private Armann and [PV1] Lund performed the overt acts alleged . . . that is the accused and Private Armann reconnoitered trails adjacent to Private First Class Bell's quarters, at or near Pioneer Kaserne, Hanau, Germany, for the purpose of determining the best method of shooting PFC Bell while she walked her dog, and . . . the accused, Private Armann and [PV1] Lund did reconnoiter and time routes from Hanau, Germany, to Buedingen, Germany, for the purpose of determining the best method of shooting PFC Bell while she was riding in an automobile, for the purpose of bringing about the object of the agreement.

Regarding the credibility of witnesses, the military judge instructed the members as follows:

11

> You have the duty to determine the believability of the witnesses.  In performing this duty you must consider each witnesses' intelligence, ability to observe and accurately remember, sincerity and conduct in court, and prejudices.  Consider also the extent to which each witness is either supported or contradicted by other evidence, the relationship each witness may have with either side, and how each witness might be affected by the verdict.

> . . . .

> Private Tarbox, Private Lund, Private Ashby and Sergeant Chapman testified under a grant of immunity . . . . In determining the credibility of [these] witness[es], you should consider the fact that  . . . these witnesses testified under grants of immunity, along with all of the other factors affecting the witnesses' believability.

The court members convicted Appellant of all charges and specifications.  However, with respect to the conspiracy, they found him not guilty of the overt act of reconnoitering the dog-walking trails.

## Discussion

Before this Court, Appellant argues that the military judge erred by refusing to give the accomplice instruction.  The Government argues that the military judge's instructions, as a whole, adequately covered the subject of witness credibility. Finally, the Government argues that any error in refusing to give the accomplice instruction was harmless because the evidence was overwhelming.

In United States v. Gillette, 35 M.J. 468, 470 (C.M.A. 1992), this Court held: "[W]henever the evidence raises a reasonable inference that a witness may have been an accomplice . . . , and upon a request of either the Government or defense, the military judge shall give the members a cautionary

12

instruction regarding accomplice testimony." See United States v. Becker, 62 F.2d 1007, 1009 (2d Cir. 1933) ("It is usually desirable to give [an accomplice instruction]; in close cases it may turn the scale . . . ."). Bigelow, 57 M.J. at 67, clarified Gillette by explaining that the "standard" instruction need not necessarily be given verbatim, but that "the critical principles of the standard accomplice instruction shall be given . . . ." One of the critical principles of the instruction is that the testimony of an accomplice must be regarded with caution. See id.

The test for determining whether a witness is an accomplice is whether the witness could be convicted of the same crime. United States v. McKinnie, 32 M.J. 141, 143 (C.M.A. 1991). In this case, PV1 Oie and PV1 Lund were convicted of conspiracy to murder PFC Bell, and PV1 Tarbox was convicted of attempted premeditated murder of PFC Bell and conspiracy to commit an aggravated assault.

We apply a three-pronged test to determine whether the failure to give a requested instruction is error: "(1) the [requested instruction] is correct; (2) 'it is not substantially covered in the main [instruction]'; and (3) 'it is on such a vital point in the case that the failure to give it deprived [the accused] of a defense or seriously impaired its effective presentation.'" United States v. Damatta-Olivera, 37 M.J. 474, 478 (C.M.A. 1993), quoting United States v. Winborn, 14 C.M.A. 277, 282, 34 C.M.R. 57, 62 (1963).

We review de novo the issue whether the error was harmless. See United States v. Pablo, 53 M.J. 356, 359 (C.A.A.F. 2000). The Government has the burden of persuasion. Id.

An erroneous failure to give an accomplice instruction is non-constitutional error. See United States v. Laing, 889 F.2d 281, 287 (D.C. Cir. 1989); United States v. Bernal, 814 F.2d 175, 184 (5th Cir. 1987). Accordingly, the test for harmlessness is whether the instructional error had "substantial influence" on the findings. If it did, or if we are "left in grave doubt, the conviction cannot stand." Kotteakos v. United States, 328 U.S. 750, 765 (1946).

In this case, the requested instruction was correct, thus meeting the first prong of the Damatta-Olivera test for instructional error. There is no dispute between the parties regarding the first prong.

We hold that the second prong is also met. In so holding, we reject the Government's argument that the military judge's instructions substantially covered the "critical principles" of the accomplice instruction. The instruction on the elements of conspiracy said nothing about the weight to be given to the testimony of a co-conspirator. There was no mention of "caution." The instruction on the grants of immunity merely informed the members that PV1 Tarbox, PV1 Lund, and PV1 Ashby had been given immunity and that the members should consider the grants of immunity in assessing their credibility. Neither of these instructions pertained to or mentioned PV1 Oie's testimony.

The general instruction on credibility told the members to consider the relationship each witness may have had to each side,

and how each witness might be affected by the verdict.  The members heard evidence about PV1 Oie's relationships with both PV1 Armann and appellant, but they knew nothing about PV1 Oie's opportunity to parlay her testimony against Appellant into a reduced sentence.  The military judge concluded that "there was no evidence that any of [the witnesses] had anything to gain."

We hold that the third prong also is met.  The thrust of the defense was to discredit the Government's witnesses.  The military judge's refusal to give the accomplice instruction "seriously impaired" the defense by depriving it of a powerful instruction that would have required the members to consider the Government's evidence with caution, because of the potential for false testimony motivated by self-interest in obtaining leniency or immunity from prosecution.

Testing for prejudice, we hold that the Government has not carried its burden of persuading us that the error was harmless with respect to the conspiracy charge.  There was no significant conflict in the evidence regarding the facts.  The conflict involved interpretation of those facts.  The court members were required to decide whether Appellant engaged in idle, marijuana-induced chatter, or serious planning; whether appellant was play-acting at the rest stop or engaged in a serious dry run of a murder plan; and whether Appellant's disparaging comments about PV1 Armann's plans were ridicule or serious critique designed to cure flaws in the plan.

The key witness in this case was PV1 Oie, as evidenced by the Government's argument and the court members' request that she be recalled.  A cautionary instruction would have alerted the

15

members to consider whether PV1 Oie's, PV1 Lund's, and PV1 Tarbox's characterizations of Appellant's actions were colored by their desire to minimize their culpability or obtain leniency at Appellant's expense. We are "left in grave doubt," regarding the effect of the instructional error on Appellant's conviction of conspiracy. Kotteakos, 328 U.S. at 765. Accordingly, we must set aside Appellant's conviction of conspiracy and the sentence.

However, with respect to the drug offenses and the false official statement, we hold that the error was harmless. PV1 Oie's testimony regarding the drug offenses was corroborated by the physical evidence seized from her room and Appellant's oral confession to SA Fitgerald. The false official statement to the CID was established by Appellant's written statement denying any knowledge of the identity of the shooter and the uncontested evidence that he told SGT Chapman that "they got her good in the neck."

## Decision

So much of the decision of the United States Army Court of Criminal Appeals as affirms Appellant's conviction of Charge I and its specification (conspiracy to murder PFC Bell) and the sentence is reversed. In all other respects, the decision below is affirmed. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals. That court may authorize a rehearing on the Charge I and its specification and the sentence, or it may dismiss Charge I and its specification and either reassess the sentence or order a sentence rehearing. Thereafter, Article 67, UCMJ, 10 U.S.C. § 867 (2002) will apply.