# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLOR, POND, and STEELE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Private E1 ADAM R. MAAS**
**United States Army, Appellant**

ARMY 20230090

Headquarters, Defense Language Institute Foreign Language Center
Jessica Conn, Military Judge (arraignment)
Robert E. Murdough, Military Judge (motions hearing and trial)
Lieutenant Colonel Yvonne L. Sallis, Staff Judge Advocate

For Appellant: Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Lieutenant Colonel Mitchell D. Herniak, JA; Captain Matthew S. Fields, JA (on brief).

For Appellee: Colonel Richard E. Gorini, JA; Lieutenant Colonel Jonathan P. Robell, JA; Major Justin L. Talley, JA (on brief).

13 January 2026

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent*

POND, Senior Judge:

An enlisted panel, sitting as a general court-martial, found appellant guilty, contrary to his pleas, of one specification of sexual assault without consent and two specifications of abusive sexual contact, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ]. The military judge sentenced appellant to a dishonorable discharge, forty months of confinement, and forfeiture of all pay and allowances.

On appeal before this court, appellant argues his convictions warrant reversal because the military judge erroneously included in his instructions that a "sleeping, unconscious, or incompetent person cannot consent," which was an

uncharged theory of criminal liability. In light of our superior court's decision in *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024), we agree that the instruction was in error but conclude the error was harmless beyond a reasonable doubt and affirm.

## BACKGROUND

### *The Sexual Assault*

The 19-year-old appellant and the 17-year-old victim were friends and fellow enlisted Soldiers who had just successfully completed their initial phase of Advanced Individual Training (AIT) together at the Presidio of Monterey in fall of 2021. For the first time, appellant, the victim, and their friends were able to request a four-day pass, a privilege they had not yet been granted, which allowed them to leave the barracks, leave post, and not have to report to formations during the upcoming Thanksgiving weekend. Appellant booked a hotel room in downtown Monterey at the Candle Bay Inn. Similarly, the victim booked a room with another female Soldier, PFC ██, at the nearby Sand Dollar hotel. The day after Thanksgiving, appellant texted the victim and another friend, Private ██, to come hang out with him at his hotel. The victim took an Uber to appellant's hotel room where she spent the day drinking, talking, and watching television with appellant, Private ██, and another Soldier. Private ██ and the other Soldier did not have authorized passes, and so they returned to post before the 2100 curfew. The victim, however, decided to stay. She wanted to continue having fun, and PFC ██ was spending time with her boyfriend in their room at the Sand Dollar. She also felt it would not be smart to take an Uber back to her hotel alone, at night, after she had been drinking. The victim slept in one bed. Appellant slept in the other. When asked if she had any concerns staying the night with appellant, the victim testified, "no...we were friends." She saw appellant as a "battle buddy," meaning they would "protect one another" and "keep each other safe."

The next morning, the victim and appellant ordered McDonald's and extended appellant's hotel room for another night. The victim split the cost of the room with appellant, so that there would be no expectation that he was doing something special for her. Private ██ returned around 1100, and the three of them once again drank, talked, and watched television in appellant's hotel room throughout the day. At around 1800 or 1900 hours, Private ██ asked appellant to step outside. Appellant complied and smoked a cigarette. While he was gone, the victim and Private ██ had consensual sex. Outside, appellant briefly saw the victim and Private ██ through the hotel window. The victim testified that while she had been drinking that afternoon, she was "still feeling normal"– not "nauseous or anything."

Private ▮ asked the victim if she wanted to come back to post with him in an Uber but she declined, not wanting to walk the ten to fifteen minutes from the gate to the barracks. After appellant returned from smoking a cigarette, the victim went into the bathroom. Private ▮ and appellant stepped outside to talk. Appellant asked Private ▮ if "it was his turn to go at it." Private ▮ told appellant "that's not a good idea . . . I don't think she sees you like that." The victim emerged from the bathroom and lay on the bed but moved to the floor because she began feeling nauseous. She went back into the bathroom because she felt like she might vomit. Private ▮ who once again had curfew, took an Uber and returned to post. Before he left, Private ▮ observed that the victim seemed "tired, a bit drunk." The victim testified that at some point—either before or after she had consensual sex with Private ▮—appellant was mixing vodka and cranberry juice drinks of which she had three to four, but she could not remember the exact order of things.

What transpired next varies significantly between the testimonial accounts of the victim and appellant at trial. The victim testified she did not remember how she got from the bathroom to the bed but awoke, clothed, on top of appellant who grabbed her hips and began moving her back and forth on top of him. The victim testified she was feeling confused and scared and was physically unable to move or speak because she was afraid. She lay limp with her eyes closed. Appellant got up at a certain point, stating, "This is a bad idea. I'm so drunk. I shouldn't do this." The victim testified she was unable to get up and leave out of fear—"it happens when I wake up and I'm afraid. I just -- flight or freeze, I can't move." Appellant returned to the bed and rolled her back and forth to touch her buttocks while she lay on her stomach and then rolled her on her back to put his hand up her shirt to touch her breasts and down her pants to touch and penetrate her vagina with his finger. Appellant then manipulated her limp body to pull her face down on the bed so that her legs were dangling off the edge, pulled her jeans down, and penetrated her vagina with his penis. The victim testified she was still limp, could not move, and felt "violated, afraid, angry" because she could not do anything. The victim also testified that she did not consent to any of the sexual acts with appellant and at no point indicated that she consented to appellant's touching of her. "I thought we were friends. I didn't agree to this. I didn't say this could happen. I didn't say it was okay . . ."

Appellant's version of events was different. He testified that when the victim emerged from the bathroom, she embraced him and they began kissing passionately. They kissed each other's necks and appellant gave the victim a hickey, which was later noted on the victim's sexual assault examination.[1] The victim then leaned into appellant causing him to fall backwards onto the bed

---

[1] Private ▮ did not recall giving the victim hickeys.

with the victim lying on top of him. Appellant testified the victim initiated and actively participated in the sexual acts not once but twice. First, she did so by removing her jeans from one leg, straddling appellant, and moving her underwear to the side. Appellant then penetrated the victim's vagina while she straddled him, moving back and forth. The victim then got off appellant, removed the rest of her pants, raised her buttocks in the air, and moved her underwear to the side. Appellant penetrated the victim's vagina with his penis a second time but from behind. Appellant did not mention digital penetration or touching the victim's breasts or buttocks. Once he ejaculated and removed his penis, the victim pulled her pants up and gave him a "look of disgust."

Both the victim and appellant testified that as soon as the sex act was over, the victim quickly dressed, grabbed her belongings, and left. The victim testified she pushed appellant away from her, told him "not to f***ing touch me," and began walking down the street towards her hotel. Appellant was screaming and crying, insisting "Whatever you think just happened didn't happen. I would never hurt you like that. It didn't happen." When they reached an intersection, the victim turned and told appellant she understood what happened, using the term "sleep paralysis" to convey that she was conscious but unable to move. Appellant told her she must think he's a monster and a terrible person. The victim then hugged appellant and told him that "everything's fine," she would not tell anyone, and she would talk to him tomorrow.

On the walk back to the Sand Dollar hotel, the victim called PFC ▮▮, who was still in their hotel room with her boyfriend. PFC ▮▮ could tell that something was wrong. When she got back to their hotel, the victim appeared upset. PFC ▮▮ texted appellant to ask what happened. Appellant called PFC ▮▮ and told her "he had done something bad, and that he's a bad person." PFC ▮▮ convinced the victim to go to the hospital to complete a sexual assault examination and called an Uber to take them to the hospital. PFC ▮▮ testified that the victim neither sounded drunk on the phone nor appeared drunk when she showed up at their hotel room.

The next morning, appellant texted his friend, PFC ▮▮, in whom he regularly confided. When PFC ▮▮ asked appellant what was wrong, he replied:

> I fucked up . . . Really bad . . . I hurt someone . . . I was so drunk and [the victim] passed out and I took advantage of her and apparently she has sleep paralysis so she witnessed it all and I feel so sick I feel so horrible . . . . How am I gonna live with myself now. Please don't tell anyone . . . .

When PFC ▮ asked if appellant had sex with the victim, he responded "Yes. But she didn't have a say and I feel so fucked up."

Appellant returned to his barracks room where his roommate awoke from his nap briefly to acknowledge appellant and went back to sleep. The roommate testified he thought he was dreaming when he heard appellant swirling around a bottle of pills. He believed it "was a really weird dream, because it was like I was witnessing this happening, but not witnessing this happening because I was asleep." Appellant swallowed an entire bottle of Ibuprofen. Appellant's roommate awoke to find the empty pill bottle and appellant drenched in sweat. When the roommate asked why he had taken all the pills, appellant responded because he had sexually assaulted someone during Thanksgiving pass. His roommate immediately notified their drill sergeant and took appellant to the hospital. While in the hospital, appellant called one of his friends to let him know he was okay. When his friend asked why he was in the hospital, appellant told him he had sexually assaulted the victim and could not live with himself anymore. Appellant told him the victim was "asleep or passed out in the bed, and he decided to have sex with her while she was passed out."

The government charged appellant with three specifications of abusive sexual contact for touching the victim's vulva, breasts, and buttocks and two specifications of sexual assault for penetrating the victim's vulva with his finger and penis, all without the victim's consent, in violation of Article 120, UCMJ.

*Trial*

At trial, in addition to the testimony described above, the government introduced the forensic medical report from the victim's sexual assault examination. There, the victim reported a loss of memory and lapse of consciousness for "a few minutes" from the bathroom to the hotel bedroom and that she "blacked out" and "woke up" to find herself in the bed on her stomach with appellant penetrating her vagina from behind. The victim also reported, in response to one of the examination questions, that her vagina had been penetrated with a finger. On cross-examination, however, the victim testified the nurse did not specify and the victim did not understand that the question applied only to acts by appellant, as opposed to also including acts by Private ▮.

A defense expert testified to memory and alcohol-induced blackouts, explaining that a person in a blackout can be "awake, alert, conscious, but not recording memory" of the event. The expert also testified that because a blackout is caused by the rapid rise of blood alcohol content, not the degree of drunkenness, a person "can have a blackout at a relatively low level of intoxication."

*Panel Instructions*

At trial, the parties had many discussions with the military judge about instructions. Relevant to this appeal, defense raised its concerns about instructing the panel on the definition of consent under Article 120, UCMJ. Civilian defense counsel stated:

> I'm thoroughly confused as to how the members could possibly piece this case out with the testimony about waking up; about the testimony about drinking, and the memory loss, when the government did not charge this as being incapable of consenting to intoxication, or incapable of consenting due to sleep.

> My concern is that the members could discuss and find, and we would never know, that they thought it was sexual assault because she was incapable of consenting due to intoxication or sleeping, and because the government chose not to charge it that way, it is not an element that they have to prove beyond reasonable doubt.

The military judge then asked the parties to review the Military Judge's Benchbook instruction on consent:

> There's a number of parentheticals in the consent instruction. For example, a person cannot consent to force causing or likely to cause likely death or grievous bodily harm. A person cannot consent when believing, due to a fraudulent representation -- that I don't believe has been raised by the evidence, but I'll hear the parties' positions on each of parentheticals that are listed in the Article 120 instructions, and the definition of consent, and if it's been raised by the evidence, then I'm inclined to give it; if it's not raised by the evidence, then I'm not inclined to give it.

> The one that I want both of you to think about is the one that says, "a sleeping, unconscious, or incompetent person cannot consent," and whether that has been raised by the evidence or not.

At a subsequent Article 39(a) hearing, defense objected to instructing the panel that "a sleeping, unconscious or incompetent person cannot consent." In response, the government argued there had been evidence that the victim "may have been asleep, unconscious or incompetent in some way" and further argued

6

that the objected to phrase was part of the statutory definition of consent. The defense also objected that the instructions did not include an element that the government was required to prove the victim was asleep or unconscious beyond a reasonable doubt. The military judge denied defense's request to modify the instructions to include such an element, stating, "I have no authority to add an element where none exists."

The defense then moved to strike "incompetent person" from the instructions, arguing there was no evidence, other than the victim being asleep or unconscious, that she was incompetent. The defense further argued the language was unnecessary and confusing:

> I believe it could be inferred as something about her fear response is what makes her incompetent, and that's not the intent of incompetent . . . the language for incompetent is for somebody who, by mental impairment because of a disability or physical impairment, because of the disability [sic], cannot consent.

The military judge overruled the defense's objection relying in part on *United States v. Roe*, 2022 CCA LEXIS 248 (Army Ct. Crim. App. 27 Apr. 2022), rev. denied, 83 M.J. 83 (C.A.A.F. 2022). In *Roe*, a panel of this court concluded that proof that a victim was asleep or unconscious can be "strong evidence" that the victim did not consent.

The military judge tailored the instructions on consent as follows:

> "Consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent. Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent. *A sleeping, unconscious, or incompetent person cannot consent.* (Emphasis added).

During closing, the trial counsel argued the victim "woke up on top of [appellant]" and the fact that the victim "could not move when she became aware of what was happening to her and was limp, is not consent." Trial counsel referred to the military judge's instructions on the definition of consent

7

and repeated that consent is a "freely given agreement" between two people, no less than four times during the argument. The trial counsel then reiterated other parts of the definition to include "An asleep, unconscious or incompetent person cannot consent."

After deliberations, the panel acquitted appellant of touching the victim's breast and penetrating her vulva with his finger but convicted appellant of two specifications of abusive sexual contact by touching the victim's vagina and buttocks and one specification of sexual assault by penetrating the victim's vulva with his penis without the victim's consent, in violation of Article 120, UCMJ.

Appellant now appeals his convictions pursuant to Article 66, UCMJ, arguing the instructions on the definition of consent were erroneous and warrant reversal.

## LAW

### *Standard of Review*

The military judge is required to "instruct the members of the court as to the elements of the offense," Article 51, UCMJ; *see also* R.C.M. 920(e), as well as "other explanations, descriptions, or directions as may be necessary." R.C.M. 920(e)(7). "The military judge has considerable discretion in tailoring instructions to the evidence and law." *United States v. Hopkins*, 56 M.J. 393, 395 (C.A.A.F. 2002). The instructions, however, must be "clear and correctly conveyed," *United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F. 2011), and provide "an accurate, complete, and intelligible statement of the law." *United States v. Behenna,* 71 M.J. 228, 232 (C.A.A.F. 2012). "Failure to provide correct and complete instructions to the panel before deliberations begin may amount to a denial of due process." *United States v. Killion*, 75 M.J. 209, 213 (C.A.A.F. 2016) (quoting *United States v. Wolford*, 62 M.J. 418, 419 (C.A.A.F. 2006)) (internal quotations omitted).

"When deciding whether the military judge properly instructed a panel, this Court uses a de novo standard of review." *United States v. Bailey*, 77 M.J. 11, 14 (C.A.A.F. 2017); *cf. United States v. Davis*, 79 M.J. 329 (C.A.A.F. 2020) (discussing affirmative waiver of objections to instructions).

Not all instructional errors are of a constitutional magnitude. *See e.g., United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003) ("An erroneous failure to give an accomplice instruction is non-constitutional error."). But if "an instructional error raises constitutional implications," courts have "traditionally tested the error for prejudice using a 'harmless beyond a reasonable doubt' standard." *United States v. Davis*, 73 M.J. 268, 271 (C.A.A.F. 2014) (quoting

*United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006)). "This standard is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction." *United States v. Upshaw*, 81 M.J. 71, 74 (C.A.A.F. 2021) (citations and internal quotations omitted). In conducting our analysis, this court "must evaluate the instructions in the context of the overall message conveyed to the [panel]." *United States v. Prather*, 69 M.J. 338, 344 (C.A.A.F. 2011) (citation and internal quotations omitted).

### *Article 120, UCMJ and Mendoza*

In this case, appellant was charged with sexual assault without consent in violation of Article 120, UCMJ. Subsequent to appellant's court-martial and this court's decision in *Roe*, upon which the military judge relied, our superior court decided *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024). That decision rejected the argument that Congress created broadly overlapping offenses under Article 120, UCMJ but rather established distinct offenses with separate theories of criminal liability. *Id.* at 215. Thus, the offense of sexual assault without consent under Article 120(b)(2)(A) is a separate and distinct offense from sexual assault when the other person is incapable of consenting due to impairment by any drug, intoxicant, or other substance under Article 120(b)(3)(A). *Id.* Consequently, the CAAF also concluded a sexual act upon a person who is asleep is a separate, distinct offense under Article 120(b)(2)(B), UCMJ. *United States v. Casillas*, __ M.J. ___, 2025 CAAF LEXIS 692, at *13 (C.A.A.F. Aug. 20, 2025).

Thus, when the government charges an accused with sexual assault without consent under Article 120(b)(2)(A), UCMJ—which "criminalizes the performance of a sexual act upon a victim who is capable of consenting but does not consent"—the government is precluded from proving lack of consent under that charge "by merely establishing that the victim was too intoxicated to consent," *Mendoza*, 85 M.J. at 220 and 222, or by "establishing that the victim was asleep at the time of the act." *Casillas* at *13.[2]

Congress defined "CONSENT" under subparagraph (g)(7) of Article 120, UCMJ as follows:

> (A) The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct

---

[2] We note, this clarification of the law supersedes this court's determination in *Roe* that the government is not foreclosed from charging and convicting an accused of sexual assault without consent by proving the victim was incapacitated. *Roe*, 2022 CCA LEXIS 248, at *14-15. Instead, a victim must be capable of consent to be convicted under this theory.

means there is no consent. Lack of verbal or physical resistance does not constitute consent. Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent.

(B) A sleeping, unconscious, or incompetent person cannot consent. A person cannot consent to force causing or likely to cause death or grievous bodily harm or to being rendered unconscious. A person cannot consent while under threat or in fear or under the circumstances described in subparagraph (B) or (C) of subsection (b)(1).

(C) All the surrounding circumstances are to be considered in determining whether a person gave consent.

## DISCUSSION

### *The instructions were erroneous.*

In appellant's case, the military judge appropriately advised the panel of the elements of the charged offense of sexual assault without consent as well as the instructions regarding reasonable mistake of fact. But in providing the statutory definition of consent, the military judge also advised the panel that "a sleeping, unconscious or incompetent person cannot consent." The sentence was not completely irrelevant as there was some evidence the victim was asleep or unconscious at one point—in particular, the victim's statement that she awoke on top of appellant and appellant's admissions that he believed the victim was unconscious or "passed out" at the time of the sex act. But by including this phrase, the instructions in essence advised the panel of two theories of criminal liability for sexual assault when appellant was only charged with one. Without an instruction clarifying otherwise, the inclusion of this language suggested to the panel that the members could convict appellant of sexual assault without consent under Article 120(b)(2)(B) if they found that the victim was asleep, unconscious, or incompetent. Because appellant was not charged with sexual assault when the victim is asleep, unconscious, or incompetent, under *Mendoza* and *Casillas*, this instruction was in error. Our fellow service court came to a similar conclusion in *United States v. Grafton*, No. 202400055, 2025 CCA LEXIS 375, at *13-14 (N.M. Ct. Crim. App. 2025), concluding the instruction "a

sleeping, unconscious, or incompetent person cannot consent" was "irreconcilable with *Mendoza*" in appellant's case where he was not charged with sexual assault while the victim was asleep, unconscious, or incompetent under Article 120(b)(2)(B).[3]

*Prejudice to Appellant was Harmless Beyond a Reasonable Doubt*

Having found error, we turn to prejudice. Because the instructional error would have relieved the government of its burden to prove appellant knew or reasonably should have known of the victim's condition under Article 120(b)(2)(B), UCMJ, as well as potentially "conflated two different and inconsistent theories of criminal liability"—the error "raises significant due process concerns." *Mendoza*, 85 M.J. at 215.[4] Thus, we apply the harmless beyond a reasonable doubt standard.

To determine prejudice, appellant argues this court should apply the two-factor test announced by the Supreme Court in *Neder v. United States*, 527 U.S. 1, 10 (1999) and later adopted by CAAF. *See e.g., United States v. Payne*, 73 M.J. 19, 25 (C.A.A.F. 2014); *United States v. Upham*, 66 M.J. 83, 86-87 (C.A.A.F. 2008). Under *Neder*, the court must determine that "(1) the element was uncontested; and (2) the element was supported by overwhelming evidence" to conclude an instructional error is harmless beyond a reasonable doubt. *Upham*, 66 M.J. at 86-87 (citing *Neder*, 527 U.S. at 17). Courts, however, have applied the *Neder* framework in cases where the element of the offense was omitted or presumed—which is, in essence, opposite sides of the same coin. *See e.g., Payne*, 73 M.J. at 25 (applying *Neder* where the instructions omitted an element of the offense); *United States v. Upham*, 66 M.J. 83, 86-87 (C.A.A.F. 2008) (applying *Neder* where the instructions incorrectly applied a presumption for two elements of the charged offense); *see also United States v. McDonald*, 57 M.J. 18 (C.A.A.F. 2002). In appellant's case, however, the element of the offense was neither omitted nor presumed. Rather, the error arose from the

---

[3] We note that after *Mendoza*, the Military Judge's Benchbook has since been revised to provide different draft instructions defining "consent" for "when 'without consent' is an element of the charged offense" and "when 'without consent' is NOT an element for the charged offense." *See* Dep't of Army Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 3a-60-2 (29 Jul. 2025) [Benchbook].

[4] We note that defense specifically disclaimed any objection based on notice: "I don't have a notice issue here . . . because I have a forensic psychologist and a sleep expert. I knew they were going to talk about intoxication; I knew they were going to possibly talk about sleep. I was prepared to defend against that. My issue now is that the government doesn't have the burden they should have to prove it beyond a reasonable doubt."

inclusion of an additional phrase in the definition. Therefore, we do not find that *Neder* provides the right analytical framework for the instructional error here.

The question before this court, however, remains whether we are "confident that there was no reasonable possibility that the error might have contributed to the conviction." *Upshaw*, 81 M.J. at 74. "To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous," but "rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991) *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991)).[5]

Here, where the evidence was overwhelming that the victim was awake, conscious, and competent at the time of the offense, we are convinced beyond a reasonable doubt that the erroneous instruction did not contribute to appellant's conviction.

While the accused's admissions following the assault indicated that he believed she was "asleep" or "passed out," the victim explained to the panel that she was, in fact, awake, aware, and conscious of what was happening. The victim testified she remembered "*waking up*, becoming aware that [she] was on the bed on top of [appellant]." (Emphasis added). She repeatedly testified at trial that she did not move and did not say anything throughout the assault—not because she was asleep and not because she was unconscious—but because she was "scared" and "afraid." On cross-examination, when defense counsel asked the victim whether she was asleep at any point during the assault, the victim replied, "No."

She further testified she did not consent to any of appellant's touches or sexual acts that evening. Once it was over, she immediately got up, buttoned her pants, grabbed her jacket, and left. When appellant followed her, telling her what she thought just happened did not happen, the victim turned and told him she understood. She told appellant she had "sleep paralysis" to "convey that I was conscious, I just couldn't move." As she explained to the panel, "it happens

---

[5] "When, for example, a trial court has instructed a jury to apply an unconstitutional presumption, a reviewing court can hardly infer that the jurors failed to consider it, a conclusion that would be factually untenable in most cases, and would run counter to a sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given." *Yates v. Evatt*, 500 U.S. 391, 403-04 (1991).

when I wake up and I'm afraid. I just – flight or freeze, I can't move." But "I didn't mean I had been diagnosed with sleep paralysis." It was just "the first term that came to mind" to convey that the victim knew what had happened. And as defense argued during closing, it did not mean "that she [was] incapable of consenting."

During an Article 39(a) session, the defense argued the panel could use the military judge's instructions to conclude that the victim was incompetent because of this fear response. The term "incompetent" is not defined by the statute, but it does not necessarily need to be. "[I]t is a well known principle that [w]ords generally known and in universal use do not need judicial definition." *United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) (citation and internal quotation omitted). And we agree with the defense counsel that incompetent is generally understood to mean a person who lacks the mental or physical capacity (or years of age) to give consent. Under the facts, here, we do not find a victim's fear response, or what could be characterized as counterintuitive behavior, equates to incompetence under the plain language of the statute, nor do we believe that a rational factfinder would have made that conclusion. Most panel members are now familiar with the idea of counterintuitive behavior. It has been over 30 years since our superior court held in *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993) that evidence was admissible to explain counterintuitive behavior of rape victims. And in appellant's case, during group voir dire, when the panel members were asked whether they were "open to the idea that a victim of sexual assault could possibly react by either fighting, fleeing, or freezing," all panel members responded affirmatively.

As the military judge properly instructed, "*All the surrounding circumstances* are to be considered in determining whether a person gave consent." *See* Article 120(g)(7) (emphasis added). The victim's reaction was but one of many circumstances that were presented to the factfinder on the issue of consent, along with evidence that the victim had been drinking throughout the day.[6] Just as nothing in the statute "bars the Government from offering evidence

---

[6] While not raised as part of the issue here, the military judge correctly denied trial defense's request to instruct the panel on the elements of incapable of consenting due to intoxication. The government was not precluded from offering evidence of intoxication where it was not the only evidence to prove nonconsent. *Mendoza*, 85 M.J. at 222. Had the military judge instructed the panel as trial defense counsel requested, the panel would have been instructed as to a third theory of criminal liability for the single charge of sexual assault. That too would have been error. But as the military judge correctly noted, based on the government's charging decision, he could not instruct on an element

(continued . . .)

of an alleged victim's intoxication to prove the absence of consent," *Mendoza*, 85 M.J. at 222, the government is also not precluded from offering evidence that a victim lay prone and unresponsive out of fear.

We do not find the trial counsel's reiteration of the military judge's instruction—"a sleeping unconscious, or incompetent person cannot consent"—raised a reasonable doubt in light of the evidence presented at trial. We note trial counsel's rebuttal, in an attempt to explain the victim's inability to move out of fear, analogized it to the state of appellant's roommate when appellant attempted to commit suicide. The roommate previously testified that at the time he heard appellant swirl the bottle of Ibuprofen, he "was asleep and not asleep." During closing, trial counsel argued the victim "was in this state, a state just like [appellant's roommate] described to you on the stand, where he knew something was going on, but he couldn't move . . . And then she's finally able to wake up and move."

We find, however, this argument was harmless beyond a reasonable doubt for several reasons. First, reviewing the government's closing as a whole, there was no explicit argument that the victim was asleep at the time of the assault. The reference to "waking up," here, was in the context of the victim's testimony, referring to her inability to move. After the victim testified during cross-examination that she was not asleep at the time of the sexual assault, defense asked:

DC: So what do you believe you were waking up from?

Victim: The inability to move.

Other portions of trial counsel's closing reflect that the government was arguing that both appellant's roommate and the victim were in "an awake state":

> In a vacuum, if you hear that someone can't move, when something has happened to them, and they're coming from an awake state, maybe you say that sounds weird, but you don't have to even do that, because you have circumstantial evidence that this is, in fact, something that happens, and direct evidence that this is something

---

(. . . continued)

when one did not exist. Although the military judge discussed "incapable of consenting" with some of the panel members during voir dire, he ultimately did not instruct the panel of the definition of incapable of consenting at the close of evidence, and courts presume panel members follow the military judge's instructions. *United States v. Custis*, 65 M.J. 366, 372 (C.A.A.F. 2007).

14

that happens, and [appellant's roommate] explained the exact same phenomenon; *when he wakes up*, he can hear the bottle twirling, but he can't really function, move, to take action. And he wasn't being sexually assaulted. *That's just an awake state.* (Emphasis added).

Second, given the evidence at trial, we do not believe that there was a reasonable inference that the victim was asleep. The victim never testified that she thought she was dreaming, or that she was unconscious, or in a state between sleep and being awake. To the contrary, she testified that she awoke on top of appellant before the sexual assault occurred and she repeatedly testified that her inability to move was due to fear, not sleep, not unconsciousness.

Even if the panel members interpreted the government's argument to infer the victim was sleeping, the military judge properly instructed the panel that "argument by counsel is not evidence, and counsel are not witnesses. If the facts as you remember, and the evidence you receive, are different from the way counsel state the facts, it is your memory of the facts that controls." Panel members are presumed to follow the military judge's instructions. *United States v. Jenkins*, 54 M.J. 12, 20 (C.A.A.F. 2000). Thus, we presume the panel in appellant's case did exactly as the military judge instructed them to do, which is apply the facts as they remembered them. Because the evidence was overwhelming that appellant committed the offenses as charged, as opposed to another theory of criminal liability under Article 120, UCMJ, we find any error in the military judge's instructions harmless beyond a reasonable doubt.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Chief Judge FLOR and Judge STEELE concur.

FOR THE COURT:

JAMES W.
Clerk of Court